375[Nos. A079068, A079232. First Dist., Div. Two. July 28, 1998.]

MCM CONSTRUCTION, INC., Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents;
MYERS/KULCHIN-CONDON, Real Party in Interest and Respondent.

**COUNSEL**

Stanton, Kay & Watson, Larry D. Dingus and Richard A. Bunn for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Gretchen Nicholson, Deputy City Attorney, Mara E. Rosales, Morrison & Foerster, Sue C. Hansen, Harold John McElhinny and Mara Elizabeth Rosales for Defendants and Respondents.

Bell, Rosenberg & Hughes, Robert Rosenberg and Howard Gray Curtis for Real Party in Interest and Respondent.

**OPINION**

**KLINE, P. J.—**

### INTRODUCTION

Appellant MCM Construction, Inc. (MCM) appeals from the judgment of the San Francisco Superior Court denying its petition for writ of mandate. MCM sought to compel respondent City and County of San Francisco (City) to set aside its award of a contract for construction of inbound and outbound highway ramps at the San Francisco International Airport to respondent Myers/Kulchin-Condon, a joint venture (Myers) and to award the contract to MCM. MCM contends the City abused its discretion in rejecting its bid as nonresponsive. MCM further contends the City abused its discretion in waiving deviations from bid instructions by Myers and in awarding the contract to Myers. In response, the City and Myers argue not only that the City did not abuse its discretion in rejecting MCM's bid and in awarding the contract to Myers, but also assert that MCM waived its right to challenge the award of the contract to Myers by failing to timely protest Myers's bid and that MCM lacks standing to challenge the award of the contract to Myers. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The City, through its airport commission, is in the midst of a $2.4 billion expansion of the San Francisco International Airport (Airport). On December 23, 1996, the Airport commission authorized the Airport director to solicit bids for construction of the new inbound and outbound highway access ramps for the Airport, contract No. 5905.A.

On April 3, 1997, the Airport received four bids for contract No. 5905.A. The bidders and the approximate amounts of their bids were: R.M. Harris Corporation (Harris)—$59.1 million; MCM—$64.1 million; Myers—$66.1 million; and Morrison-Knudsen/Kiewit Pacific, Joint Venture (MK)—$72.7 million. Although Harris's bid was the lowest, it was rejected as nonresponsive because Harris failed to list any of its subcontractors and did not comply with any of the City's minority business enterprise (MBE) and woman-owned business enterprise (WBE) requirements. MCM's bid was second low, followed by Myers and MK.

The Airport's "Instructions to Bidders" required each competitor to submit its bid documents in three separate envelopes, marked A, B, and C. Envelopes A and B were to be submitted at or before 2 p.m. April 3, 1997. Envelope C was to be submitted at or before 5 p.m. April 3, 1997. Paragraph 18.f of the bidding instructions specified that envelope B was to contain various documents, including form 430 ("Subcontractors List"), on which bidders were to list all subcontractors, suppliers, truckers and vendors whose work or service would exceed one-half of 1 percent of the total bid, indicating which of the firms, if any, bidders intended to use to meet the MBE/WBE subcontracting goals for the contract. That provision also clearly stated that the bidder must "furnish information required on this form, in accordance with instructions contained herein, and Section 6.48 of the SFAC [San Francisco Administrative Code]." Section 6.48 of the San Francisco Administrative Code requires in part that the bidder set forth a "brief description of the work which will be done" by each subcontractor listed and the "amount to be paid" to each such subcontractor. (S.F. Admin. Code, § 6.48.)

Envelope C was to contain, among other documents, form 431 ("Supplemental Subcontractors List"), which required similar information as to subcontractors, suppliers, truckers and vendors that the bidder intended to use to meet the MBE/WBE goals, whose work or service would equal or be less than one-half of 1 percent of the total bid.

The Instructions to Bidders cautioned that bidders "must supply all information required by Bid documents and specifications. Bids must be full

and complete. The Commission reserves the right in its sole discretion to reject any Bid as nonresponsive as a result of any error or omission in the Bid." (Instructions to Bidders, ¶ 7.)

Envelopes B and C were opened after 5 p.m.[1] The Harris bid was lowest. However, it failed to meet several bid requirements and Harris did not challenge the commission staff's preliminary determination that its bid was nonresponsive. MCM's bid was second lowest, followed by Myers and MK.

MCM's form 430, submitted in envelope B, listed nine subcontractors, but failed to identify, as required, the price to be paid to seven of those subcontractors. MCM also failed to describe the work to be performed by one of the subcontractors.[2]

Myers submitted six pages of form 430 in envelope B at 2 p.m. When all the bids were opened at 5 p.m. it was discovered that Myers had submitted a single page of form 430 in the wrong envelope. Instead of being in envelope B, delivered to the Airport prior to 2 p.m., a single page of form 430 listing Rosendin Electric as a subcontractor at a price of $3 million was included in envelope C, which was submitted at 5 p.m.

On April 7, 1997, the commission, through the project manager for this contract, notified MCM that its bid "appear[ed] to be nonresponsive," as its failure to list dollar amounts for seven of the nine subcontractors violated the requirements of the bidding documents and San Francisco Administrative Code section 6.48. In addition, Myers and MK wrote the Airport staff protesting the nonresponsive bids by Harris and MCM, while MK further protested the responsiveness of Myers's bid. MCM did not protest any of its competitor's higher priced bids.

On April 11, 1997, MCM responded to the Airport, asserting that the City could not legally require it to list the prices to be paid to subcontractors, as section 6.48 of the San Francisco Administrative Code imposed requirements above and beyond the mandates of state law, and therefore could not be used to determine the responsiveness of MCM's bid. In addition, MCM argued, its failure to include that information was inconsequential and should be waived. On April 17, 1997, MCM sent to the Airport a list of subcontractors, bid items, and dollar amounts related to the work those

---

[1]Envelope A, which was to contain information regarding experience, financial qualifications, safety experience and various other affidavits and certificates, was opened at 2 p.m.

[2]It appears MCM's failure to list work to be performed by one of the subcontractors ultimately was not a basis for determining the bid nonresponsive, as MCM agreed it would do that work itself, as permitted by the Public Contract Code. (Pub. Contract Code, § 4106.)

subcontractors would do. MCM asserted that the commission could use that list to "determine the approximate prices of each subcontractor's work."

On April 23, 1997, Myers responded to a protest filed by the highest bidder, MK. Myers argued that its deviation from the strict letter of the bid instructions was at most a minor "irregularity" which the Airport had authority to waive. In support of its response, Myers submitted the declarations of Mona Borup and Michael Condon, members of Myers's bid team. Borup, the Kulchin-Condon contract administrator who wrote out the Rosendin Electric information on the form 430 page, declared that among the forms she had prepared before 2 p.m. for inclusion in envelope B was the page that instead was included in envelope C. In particular, Borup testified that she "personally wrote Rosendin's name and price in the appropriate form and placed the filled-out form with the other subcontractor listing forms that I knew had to be sealed in Envelope B." She personally verified by means of her handwriting that the form unsealed by the Airport staff in Myers's envelope C was the same form she prepared prior to 2 p.m. Both Borup and Condon verified that, to the best of their knowledge, no member of the Myers's bid team communicated with Rosendin or any other electrical contractor between 2 p.m. and 5 p.m. on April 3d. Myers also reminded the Airport staff that, in accordance with paragraph 20 of the bid instructions, all bidders' envelopes B and C remained sealed until after the official bid opening at 5 p.m., further negating the chance that some unfair advantage could have been obtained by Myers.

The bids, protests and responses were evaluated by the Airport staff and the city attorney. They concluded the subcontractor information MCM had omitted from its form 430 could not be determined by looking at other bid documents. Accordingly, that omission could not be waived and the bid was nonresponsive. The staff also concluded that Myers's bid substantially conformed to the bid requirements, in that the inclusion of the Rosendin page in envelope C did not affect the amount of the bid or give an unfair advantage to Myers. On April 25, 1997, the Airport staff notified MCM that it intended to recommend to the commission, at its May 6, 1997, meeting, that MCM's bid be rejected.

At its May 6, 1997, meeting, the commission heard testimony from staff and from counsel for MK, MCM, and Myers. The commission also had before it a letter from MCM, dated May 5, 1997, and submitted for the hearing, reiterating MCM's position and, for the first time, challenging the fairness of waiving the Myers's bid deviations. Following the staff's report and recommendation, counsel for MCM spoke, reiterating its argument that

its bid was responsive and challenging the responsiveness of Myers's bid, primarily by referring to the remarks previously made by MK's attorney.

At the conclusion of the hearing the commission voted to award the contract to Myers, finding that MCM's bid was nonresponsive because it failed to comply with the requirements of the bid invitation and the San Francisco Administrative Code. The resolution adopted by the commission found that "any nonconformity in the [Myers] bid constitutes a minor irregularity which does not impact the time, price or quality of the work supplied, and therefore an informality which the Commission may and does waive in deciding to award this contract . . . ." (Airport Com. Res. No. 97-0119.)

On May 7, 1997, MCM filed a petition for writ of mandate. After a hearing on May 23, 1997, Judge William J. Cahill denied the petition. MCM then filed a petition for writ of mandate and request for stay in this court, which we denied on June 11, 1997. A final judgment and order of dismissal was entered by the superior court on June 16, 1997. On June 17, 1997, MCM appealed from the order denying its petition and on June 30, 1997, from the final judgment.[3]

DISCUSSION

I.

*The Airport Commission Did Not Abuse Its Discretion in Finding MCM's Bid Nonresponsive*

MCM contends the City abused its discretion in rejecting MCM's bid as nonresponsive on the basis that MCM failed to list the dollar amount of work to be performed by subcontractors. MCM argues that this requirement, imposed by the City's invitation to bid and San Francisco Administrative Code section 6.48(c), could not serve as the basis for determining responsiveness as it imposed a requirement above and beyond the requirements of the Subletting and Subcontracting Fair Practices Act (Act). (Pub. Contract Code, § 4100 et seq.) Second, MCM argues that in the event these requirements are valid, the City could and should have waived this deviation from the strict requirements of the bid documents as the deviation did not affect the amount of MCM's bid and was, consequently, insubstantial.

---

[3]Two appeals were apparently taken in an abundance of caution. Both the order denying its writ petition and the final judgment are appealable orders where no issues remain to be determined. (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1998) ¶ 2:111, p. 2-53, rev. #1, 1997.)

Finally, MCM contends the City's conduct in rejecting MCM's bid as nonresponsive, while waiving the deviations in the Myers bid, constituted favoritism. We disagree.

A.

Appellate review of the award of a public contract is governed by certain well-established principles. In a mandamus action arising under Code of Civil Procedure section 1085, we limit our review to an examination of the proceedings before the agency to determine whether its findings and actions are supported by substantial evidence. (E.g., *Ghilotti Construction Co.* v. *City of Richmond* (1996) 45 Cal.App.4th 897, 903-904 [53 Cal.Rptr.2d 389] (*Ghilotti*); *Valley Crest Landscape, Inc.* v. *City Council* (1996) 41 Cal.App.4th 1432, 1437 [49 Cal.Rptr.2d 184]; *Konica Business Machines U.S.A., Inc.* v. *Regents of University of California* (1988) 206 Cal.App.3d 449, 453-454 [253 Cal.Rptr. 591] (*Konica*); *Taylor Bus Service, Inc.* v. *San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341 [241 Cal.Rptr. 379].) "Our review is limited to an examination of the proceedings to determine whether the City's actions were arbitrary, capricious, entirely lacking in evidentiary support or inconsistent with proper procedure. There is a presumption that the City's actions were supported by substantial evidence, and [petitioner/plaintiff] has the burden of proving otherwise. We may not reweigh the evidence and must view it in the light most favorable to the City's actions, indulging all reasonable inferences in support of those actions. [Citations.] Mandamus is an appropriate remedy to compel the exercise of discretion by a government agency, but does not lie to control the exercise of discretion unless under the facts, discretion can only be exercised in one way. [Citations.]" (*Ghilotti, supra,* 45 Cal.App.4th 897, 903-904, fn. omitted.)

"Generally, cities, as well as other public entities, are required to put significant contracts out for competitive bidding and to award the contract to the lowest responsible bidder. (See, e.g., Pub. Contract Code, § 20162.) A bidder is responsible if it can perform the contract as promised. (*Taylor Bus Service, Inc.* v. *San Diego Bd. of Education, supra,* 195 Cal.App.3d at p. 1341.) A bid is responsive if it promises to do what the bidding instructions require. (*Ibid.*) Usually, whether a bid is responsive can be determined from the face of the bid without outside investigation or information. (*Id.* at p. 1342.)" (*Valley Crest Landscape, Inc.* v. *City Council, supra,* 41 Cal.App.4th 1432, 1438.)

"In enacting the Subletting and Subcontracting Fair Practices Act (the Act), the Legislature found the practices of bid shopping and bid

peddling[4] resulted in poor quality of materials and workmanship, deprived the public of the benefits of fair competition, and led to insolvencies, loss of wages, and other evils. (Pub. Contract Code, § 4101.) Bid shopping occurs where the general contractor uses the lowest bid received to pressure other subcontractors to submit even lower bids. [Citation.] The Act requires bidders for public contracts to list the names of all subcontractors who will perform work in an amount in excess of one-half of 1 percent of the prime contractor's bid. (Pub. Contract Code, § 4104, subd. (a).) The bidder must also set forth: 'The portion of the work which will be done by each subcontractor under this act. The prime contractor shall list only one sub-contractor for each portion as is defined by the prime contractor in his or her bid.' (Pub. Contract Code, § 4104, subd. (b).)" (*Valley Crest Landscape, Inc.* v. *City Council, supra,* 41 Cal.App.4th 1432, 1438.)

"The purpose of requiring governmental entities to open the contracts process to public bidding is to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition. (See legis. intent declared in Pub. Contract Code, § 10300; [citations].) Because of the potential for abuse arising from deviations from strict adherence to standards which promote these public benefits, the letting of public contracts universally receives close judicial scrutiny and contracts awarded without strict compliance with bidding requirements will be set aside. This preventative approach is applied even where it is certain there was in fact no corruption or adverse effect upon the bidding process, and the deviations would save the entity money. [Citations.] The importance of maintaining integrity in government and the ease with which policy goals underlying the requirement for open competitive bidding may be surreptitiously undercut, mandate strict compliance with bidding requirements. [Citation.]" (*Konica, supra,* 206 Cal.App.3d at pp. 456-457.) In *Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 176 [36 Cal.Rptr.2d 521, 885 P.2d 934], the Supreme Court cited this passage from *Konica* with approval. (See *Ghilotti, supra,* 45 Cal.App.4th at pp. 907-908.) ▮ However, "[t]he rule of strict compliance with bidding requirements does not preclude the contracting entity from waiving inconsequential deviations." (*Id.,* at p. 908.)

---

4" 'Bid shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids. Bid peddling, conversely, is an attempt by a subcontractor to undercut known bids already submitted to the general contractor in order to procure the job. The statute is designed to prevent only bid shopping and peddling that takes place after the award of the prime contract . . . . Bid peddling and shopping prior to the award of the prime contract foster the same evils, but at least have the effect of passing the reduced costs on to the public in the form of lower prime contract bids.' (*Southern Cal. Acoustics Co.* v. *C. V. Holder, Inc.* [(1969)] 71 Cal.2d [719,] 726, fn. 7 [79 Cal.Rptr. 319, 456 P.2d 975], citations omitted.)" (*Cal-Air Conditioning, Inc.* v. *Auburn Union School Dist.* (1993) 21 Cal.App.4th 655, 661, fn. 1 [26 Cal.Rptr.2d 703].)

"Other cases cited by *Konica, supra,* for the proposition that a deviating bid must be set aside despite the absence of corruption or actual adverse effect on the bidding process make it clear that the deviation must be capable of facilitating corruption or extravagance, or likely to affect the amount of bids or the response of potential bidders. [Citations.] These considerations must be evaluated from a practical rather than a hypothetical standpoint, with reference to the factual circumstances of the case. They must also be viewed in light of the public interest, rather than the private interest of a disappointed bidder. 'It certainly would amount to a disservice to the public if a losing bidder were to be permitted to comb through the bid proposal or license application of the low bidder after the fact, [and] cancel the low bid on minor technicalities, with the hope of securing acceptance of his, a higher bid. Such construction would be adverse to the best interests of the public and contrary to public policy.' (*Judson Pacific-Murphy Corp.* v. *Durkee* (1956) 144 Cal.App.2d 377, 383 . . . .)" (*Ghilotti, supra,* 45 Cal.App.4th at pp. 908-909.)[5]

### B.

 With these principles in mind, we turn to MCM's contention that the requirement that bidders list the dollar amount of work to be performed by subcontractors, imposed by the City's invitation to bid and San Francisco Administrative Code section 6.48(c), could not serve as the basis for determining responsiveness. MCM argues that the City could not enforce a requirement above and beyond those of the Act. We are convinced the City can enforce its own more restrictive bid requirements.

### 1.

MCM relies upon *Valley Crest Landscape, Inc.* v. *City Council, supra,* 41 Cal.App.4th 1432 (*Valley Crest*), for the proposition that the City may not

---

[5]"In *Domar, supra,* our Supreme Court emphasized the necessity of a pragmatic approach, placing the public interest above the interests of the bidders: 'As one leading treatise explains: "The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose. Competitive bidding provisions must be read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way." (10 McQuillin, Municipal Corporations (3d rev. ed. 1990) § 29.29, p. 375, fns. omitted.) Thus, [laws] requiring competitive bidding are not to be given such a construction as to defeat the object of insuring economy and excluding favoritism and corruption. [Citations.]' (9 Cal.4th at p. 173.)" (*Ghilotti, supra,* 45 Cal.App.4th at p. 909.)

impose an additional requirement not found in the Act. We do not so read the case. In fact, it stands for the opposite position, holding that the city could not waive a requirement of its own specification to bidders requiring the contractor to perform contract work amounting to not less than 50 percent of the original total contract price. (*Id.* at pp. 1436, 1441.) In *Valley Crest* the bid request required the bidder perform at least 50 percent of the work itself and required the bidder to set forth the percentage of work to be performed by each subcontractor. (*Id.* at p. 1435.) The low bidder listed subcontractor work as 83 percent of its bid. When the city pointed this out to the low bidder, it responded that the percentages were not correct and submitted new percentages totaling 44.65 percent. (*Ibid.*) Valley Crest, the second lowest bidder on the project, petitioned for a writ of mandate to set aside the award of the contract to the low bidder as nonresponsive on the ground that changes made in the low bid violated the Act. The Court of Appeal held that the low bidder could not change its bid and the city could not waive the deviation. (*Ibid.*) However, in reaching that conclusion, the court first rejected Valley Crest's contention that the change of subcontractor percentages violated the Act. It agreed with the city and the low bidder that "the Act does not require the percentage of the subcontractor's work; that requirement was imposed by the City to ensure compliance with the City's requirement that the prime contractor perform at least 50 percent of the contract." (*Id.* at p. 1439.) The Act referred to the "portion" of work to be done by each subcontractor. (Pub. Contract Code, § 4104, subd (b).) That "portion" need not be stated as a percentage of the contract. "We decline to add a requirement not found in the statute. We conclude the percentage requirement was included to show compliance with . . . the specifications and was independent of the requirements of the Act." (41 Cal.App.4th at p. 1440.)

The Court of Appeal simply refused to read into the *Act* an additional requirement not found in the *Act* itself. It did not preclude the city from using its more restrictive bid specifications to determine bid responsiveness. Indeed, the Court of Appeal refused to allow the city to waive its own 50 percent requirement because the "specification made listing the subcontractor percentages a material element of the bid." (41 Cal.App.4th at p. 1443.) The appellate court refused to allow application of the doctrine that inconsequential irregularities may be waived by the city to permit the change in bid percentages. The court reasoned that waiver of an irregularity in a bid should be allowed only if it would not give the bidder an unfair advantage by allowing it to withdraw its bid without forfeiting its bid bond. (*Id.* at pp. 1442-1443.) "The City could not permit the mistake as to this material

element of the bid to be corrected by purporting to 'waive an irregularity.' " (*Id.* at p. 1443.)[6] *Valley Crest* does not support MCM's argument.

### 2.

Moreover, as a "charter city," as that status is recognized in the California Constitution (Cal. Const., art. XI, §§ 2, 3), the City is empowered by the Constitution to govern its own "municipal affairs" to the extent the field is not preempted by state law. In this regard, article XI, section 5, provides in relevant part: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." (Cal. Const., art. XI, § 5, subd. (a).)

On appeal, MCM does not expressly argue that state law preempts the City's efforts to impose bidding requirements for public works projects in addition to those required in the Act. Rather, it argues that the City could not impose requirements "above and beyond" the Act. Our Supreme Court has held, "The expenditure of city funds on a city's public works project is a municipal affair. . . ." (*Domar Electric Inc.* v. *City of Los Angeles, supra,* 9 Cal.4th 161, 170-171, citations omitted.) "Thus, it is within the purview of a chartered city's ample autonomy over municipal affairs to enact a comprehensive program designed to achieve the fiscally sound purposes of competitive bidding. Competitive bidding laws are passed for the benefit and protection of the taxpaying public, not for the benefit and enrichment of bidders. (*Id.,* at p. 173.) Their purposes, among others, are ' "to guard against favoritism, improvidence, extravagance, fraud and corruption; to prevent the waste of public funds; and to obtain the best economic result for the public" [citations] . . . .' (*Ibid.*)" (*Stacy & Witbeck, Inc.* v. *City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1094-1095 [44 Cal.Rptr.2d 472]; see also *R & A Vending Services, Inc.* v. *City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1192 [218 Cal.Rptr. 667] [state general law bidding procedures do not bind chartered cities where the subject matter of the bid constitutes a municipal affair]; accord, *Piledrivers' Local Union* v. *City of Santa Monica* (1984) 151 Cal.App.3d 509, 511-512 [198 Cal.Rptr. 731];

---

[6]In *Ghilotti,* the appellate court refused to read *Valley Crest* as holding that a *potential* competitive advantage precludes waiver of a bid irregularity, without the need to show any *actual* advantage. (*Ghilotti, supra,* 45 Cal.App.4th 897, 912, fn. 6.) "The *Valley Crest* court held [the low bidder] had an actual advantage, not only because it could have obtained relief under the Public Contract Code as a matter of law, but also because the city expressly gave [it] the opportunity to withdraw its bid. (41 Cal.App.4th at p. 1442, and fn. 1.)" (*Ibid.*)

*Smith* v. *City of Riverside* (1973) 34 Cal.App.3d 529, 534 [110 Cal.Rptr. 67].)[7]

We conclude that the City was not precluded from requiring that bidders list in their bids the dollar amount of work to be performed by subcontractors.

### C.

 MCM argues that assuming these City-imposed bid requirements are valid, the City could and should have waived this deviation from the strict requirements of the bid specifications as the deviation did not affect the amount of MCM's bid and was, consequently, insubstantial. The City argues that MCM's failure to list the dollar amount of work to be performed by subcontractors was material and not waivable by the City.

### 1.

As a threshold matter, MCM's argument founders upon its assumption that if the deviation from bid specifications were immaterial and thus could be waived by the City, the City necessarily abused its discretion in refusing to waive the deviation. No case cited by MCM holds that where the City *can* waive a deviation it *must* do so. In *Valley Crest, supra,* 41 Cal.App.4th 1432, the court reversed the city's waiver of a bid requirement, where the requirement was held material and hence not waivable. In *Ghilotti, supra,* 45 Cal.App.4th 897, the court held the city did not err in waiving insubstantial variations from specifications. These authorities do not support the proposition that the contracting agency *must* waive deviations from bid requirements where it has the power to do so. These cases and others like them, which address the issue whether and under what circumstances a deviation from bid specifications is waivable by the agency, use permissive language to describe the agency's power to waive immaterial deviations: "[A] bid which substantially conforms to a call for bids *may*, though it is not strictly

---

[7]*Monterey Mechanical Co.* v. *Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391 [52 Cal.Rptr.2d 395], is distinguishable. There, the appellate court held the district abused its discretion when it rejected plaintiff's bid for failure to demonstrate it had made a good faith effort to comply with the district's affirmative action goals as measured by the district's written criteria. Public Contract Code section 2000, subdivision (b)(1), contains the exclusive criteria for assessing good faith efforts to satisfy affirmative action goals, and the district was without authority to assess good faith according to its own criteria insofar as they differed from the statutory criteria. The Legislature had made explicit its intent " '*to occupy the whole field* of regulation of procedures for determining good faith efforts by bidders on public works contracts . . . .' (Stats. 1986, ch. 1060, § 4, p. 3723, italics added.)" (44 Cal.App.4th at pp. 1401-1402.)

responsive, *be accepted* if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential. [Citations.]" (47 Ops.Cal.Atty.Gen. 129, 130 (1966), italics added, quoted with approval in *Ghilotti, supra,* 45 Cal.App.4th at pp. 904-905, *Valley Crest, supra,* at pp. 1440-1441, *Konica, supra,* 206 Cal.App.3d 449, 454, and *National Identification Systems, Inc.* v. *State Bd. of Control* (1992) 11 Cal.App.4th 1446, 1453 [15 Cal.Rptr.2d 257].) "The rule of strict compliance with bidding requirements *does not preclude* the contracting entity from waiving inconsequential deviations." (*Ghilotti, supra,* at p. 908, italics added.) "The city could not *permit* the mistake as to this material element of the bid to be corrected by purporting to 'waive an irregularity.' " (*Valley Crest, supra,* at p. 1443, italics added.) Clearly the foregoing language is not mandatory, but permissive.

MCM concedes, as it must, that it did not fully comply with bid specifications. Given that fact, the City was not required to award MCM the bid even if its deviations were immaterial.[8] An agency has discretion to waive immaterial deviations from bid specifications and may accept the bid under certain conditions. The point of discretion is that the agency may properly act in either direction. It may waive or refuse to waive such deviations.

2.

City argues that the deviations are material and that it had no power to waive such deviations in any event.

On questions of fact, we defer to the findings of the public agency, where supported by substantial evidence. One such finding is that the omitted sums

---

[8]The cases in this area generally involve challenges by unsuccessful responsive bidders arguing that the public agency abused its discretion in waiving a deviation from bidding requirements by the winning bidder. (See *Ghilotti, supra* 45 Cal.App.4th 897; *Valley Crest, supra,* 41 Cal.App.4th 1432; *Konica, supra,* 206 Cal.App.3d 449; *Menefee* v. *County of Fresno* (1985) 163 Cal.App.3d 1175 [210 Cal.Rptr. 99].)

*Monterey Mechanical Co.* v. *Sacramento Regional County Sanitation Dist., supra,* 44 Cal.App.4th 1391, is one case that does involve an attack by the low bidder, arguing the public agency abused its discretion in rejecting the low bidder's bid on the ground that the low bidder had failed to demonstrate its good faith efforts to comply with the district's affirmative action goals as measured by the district's written criteria. The appellate court held the district abused its discretion in rejecting the bid because the Public Contract Code contained the exclusive criteria for assessing good faith efforts to satisfy affirmative action goals and the district was without authority to assess good faith according to its own criteria. Here, we have determined the City could require bidders to comply with its own requirements in addition to those of the Public Contract Code. *Monterey Mechanical Co.* does not stand for the proposition that the public agency must waive immaterial discrepancies with valid bid requirements.

could not be determined from the bid. At the commission hearing, Tom Kardos, deputy director of the Airport, was asked whether he agreed with MCM that one could determine the subcontractor amounts from the actual information within MCM's bid package. He responded in the negative. "The bid did not define the scope of the individual subcontractors participating in that particular bid item. So we made a special effort, staff did, to try to decipher and establish the scope associated with the role of the subcontractors, and we weren't able to establish those, the associated amounts."

" 'Whether in any given case a bid varies substantially or only inconsequentially from the call for bids is a question of fact.' (47 Ops.Cal.Atty.Gen., *supra*, at p. 131.) Under *Konica*, the factual issue to be resolved is whether the variation resulted in an unfair competitive advantage in the bidding process." (*Ghilotti, supra*, 45 Cal.App.4th at p. 906.)

The City and Myers do not contend the failure to list the dollar amount of work to be performed by each subcontractor could have affected the amount of the bid. Rather, they contend MCM received an advantage or benefit not allowed other bidders in that it was given the opportunity to withdraw its bid. Several cases have concluded that "[w]aiver of an irregularity in a bid should only be allowed if it would not give the bidder an unfair advantage by allowing the bidder to withdraw its bid without forfeiting its bid bond. [Citation.]" (*Valley Crest, supra*, 41 Cal.App.4th at p. 1442, citing *Menefee v. County of Fresno, supra*, 163 Cal.App.3d 1175, 1178-1181.)

In *Valley Crest*, the court found the bidder had an unfair advantage where it could have withdrawn its bid under Public Contract Code section 5103. "Misstating the correct percentage of work to be done by a subcontractor is in the nature of a typographical or arithmetical error. It makes the bid materially different and is a mistake in filling out the bid. As such, under Public Contract Code section 5103, North Bay [the low bidder] could have sought relief by giving the City notice of the mistake within five days of the opening of the bid. That North Bay did not seek such relief is of no moment. The key point is that such relief was available. Thus, North Bay had a benefit not available to the other bidders; it could have backed out. Its mistake, therefore, could not be corrected by waiving an 'irregularity.' " (41 Cal.App.4th at p. 1442, fn. omitted.) At the same time, the court noted that "apart from the relief afforded by section 5103 of the Public Contract Code, the City gave North Bay the opportunity to withdraw its bid. The City's letter to North Bay stated the bid would be considered nonresponsive unless North Bay provided additional information." (*Id.*, at p. 1442, fn. 1.) Subsequently, *Ghilotti* refused to read *Valley Crest* as holding that a *potential*

competitive advantage precludes waiver of a bid irregularity, without the necessity of showing an *actual* advantage. "The *Valley Crest* court held North Bay had an actual advantage, not only because it could have obtained relief under the Public Contract Code as a matter of law, but also because the city expressly gave North Bay the opportunity to withdraw its bid. (41 Cal.App.4th at p. 1442, and fn. 1.)" (*Ghilotti, supra,* 45 Cal.App.4th at p. 912, fn. 6.)

Here, too, MCM had an *actual* advantage as the City gave MCM an opportunity to withdraw its bid without forfeiting its bid bond when it informed MCM that its bid would be considered nonresponsive if it did not provide additional information. The City advised MCM that in such case it would proceed to review the next lowest bid.[9]

MCM responds that the City cannot unilaterally create an unfair advantage situation by giving a nonresponsive bidder the opportunity to withdraw its bid. Although this is an interesting question, it need not detain us long. Initially, we point out that the question only arises because of MCM's failure to comply with valid bid requirements of the San Francisco Administrative Code and the invitation to bid. In no other instance that we have found has the nonresponsive bidder argued that the city was prohibited from allowing it to withdraw its bid, but rather was required to waive deviations from bid requirements. In any event, MCM had not only an *actual* opportunity to withdraw its bid, but also was *entitled* to do so under the provisions of Public Contract Code section 5103.

 *Menefee* v. *County of Fresno, supra,* 163 Cal.App.3d 1175, found that under the statutes for relief of bidders on public contracts,[10] the only mistakes which could release a bidder from its bid are typographical or

---

[9]The letter so informing MCM provided: "Dear Mr. Carter [¶] Thank you for submitting a bid for the Airport Contract 5905.A, the Inbound and Outbound Ramps. Our review of your bid indicates that it appears to be non-responsive. [¶] The bid submitted did not include the dollar amounts from seven of the nine subcontractors listed on Form 430. This is a violation of the requirements of the bidding documents and the San Francisco Administrative Code Section 6.48. [¶] If you disagree with this determination, please notify us in writing by close of business Friday, April 11, 1997, of the reasons why your bid should not be rejected as non-responsive. If we do not receive a response from you, we will proceed with reviewing the next apparent low bid. [¶] Very truly yours, Michael Lane, Project Manager."

[10]Public Contract Code section 5101 provides:

"(a) A bidder shall not be relieved of the bid unless by consent of the awarding authority nor shall any change be made in the bid because of mistake, but the bidder may bring an action against the public entity in a court of competent jurisdiction in the county in which the bids were opened for the recovery of the amount forfeited . . . .

"(b) If an awarding authority for the state consents to relieve a bidder of a bid because of mistake, the authority shall prepare a report in writing to document the facts establishing the

arithmetical errors, not mistaken submission of a bid. (*Id.*, at p. 1181; Pub. Contract Code, § 5103.) "Relief is only allowed if the bidder can establish that '[t]he mistake was made in filling out the bid and not due to error in judgment or to carelessness in inspecting the site of the work, or in reading the plans or specifications.' (Pub. Contract Code, § 5103, subd. (d).) This statute clearly does not contemplate relief from the mistaken *submission* of a bid." (*Menefee* v. *County of Fresno, supra,* at p. 1181, italics in original.) *Menefee* held that where a bidder had failed to sign the bid on the appropriate line, the bid was nevertheless valid because it was signed elsewhere. The relief sought was not for a typographical or arithmetical error, but for a mistaken submission of a bid. Consequently, the bidder could not be released from its bid. Since relief was not available, the irregularity could be waived. (*Ibid.*)

■■■ *Valley Crest* held that misstating the correct percentage of work to be done by a subcontractor was "in the nature of a typographical or arithmetical error. It makes the bid materially different and is a mistake in filling out the bid." As such, the contractor could have sought relief under Public Contract Code section 5103. Consequently, the contractor's ability to withdraw its bid without forfeiting its bond constituted an unfair advantage and the city could not waive the irregularity. (*Valley Crest, supra,* 41 Cal.App.4th 1432, 1442.)

We believe the failure to state dollar amounts of work to be performed by seven of nine subcontractors is, like the misstatement of the correct percentage of work to be done by subcontractors in *Valley Crest*, "in the nature of a typographical or arithmetical error." As such, MCM could have sought relief under the statute and had an advantage not available to other bidders. The City was without power to waive the deviation.

3.

■■■ MCM contends that the City acted unfairly in refusing to waive its deviations from bid specifications, while waiving Myers's mistakes. First,

existence of each element required by Section 5103. The report shall be available for inspection as a public record. . . ."

Where the bidder seeks recovery of the forfeited amounts, Public Contract Code section 5103 requires: "The bidder shall establish to the satisfaction of the court that;

"(a) A mistake was made.

"(b) He or she gave the public entity written notice within five days after the opening of the bids of the mistake, specifying in the notice in detail how the mistake occurred.

"(c) The mistake made the bid materially different than he or she intended it to be.

"(d) The mistake was made in filling out the bid and not due to error in judgment or to carelessness in inspecting the site of the work, or in reading the plans or specifications."

we agree with the City and Myers that Myers's untimely submission of its Rosendin subcontractor listing was different from the type of deviation of the MCM bid. As explained by Deputy City Attorney Gretchen Nicholson at the commission hearing: "As I understand the question, you want to know why one deviation can be waived and why the other deviation cannot be waived. [¶] The requirement to list the amount of the subcontract is a requirement of San Francisco's Administrative Code Provision 6.48 and that is something that the Commission and the City has consistently enforced. It was enacted to discourage bid shopping. It is not something that is waived. [¶] Whereas the failure to list the subcontractor in the 2 o'clock envelope and instead list it in the 5 o'clock envelope was not a change in the bid or a correction of a mistake in the bid. The envelope that came in at 5 o'clock was part of the bid. It came admittedly in at the wrong time, but it was a deviation which didn't go to affecting the price or give a competitive advantage, and that's why it can be waived."

Moreover, to the extent MCM's argument may be construed to contend that the City's award to Myers constituted favoritism, MCM failed to make any showing or to introduce any evidence of such "favoritism" apart from the fact that City found Myers's deviation inconsequential and its bid responsive and refused to waive a very different type of bid deviation by MCM, finding its bid nonresponsive. MCM failed to demonstrate favoritism.

Finally, to the extent such claim of unfairness is rooted in MCM's challenge of the award of the contract to Myers, it must fail because, as we explain hereafter, MCM waived any right to challenge the award of the contract to Myers by failing to protest Myers's bid.

## II.

### MCM Waived Any Right to Challenge Myers's Bid

■ Respondents argue that MCM cannot challenge the award of the public works contract to Myers. They contend that MCM waived any right to protest Myers's bid by failing to comply with mandatory procedures set forth in the bid instructions for bid protests. We agree.

The bid instructions for the contract set forth mandatory procedures for bid protests. (Instructions to Bidders, ¶ 22.) These included the requirement that "any bid protest must be submitted in writing to [the] Deputy Director

. . . before 5 p.m. of the 10th business day following bid opening."[11] Consequently, to protest the Myers's bid, MCM was required to do so in writing, with accompanying documentation, including "a complete statement for the basis for the protest" (*Id.,* ¶ 22, subd. (a)), on or before April 17, 1997. The bid instructions provide that "The procedure and time limits set forth in this paragraph are mandatory and are the Bidder's sole and exclusive remedy in the event of Bid protest and failure to comply with these procedures shall constitute a waiver of any right to further pursue the Bid protest, including filing a Government Code Claim or legal proceedings." (*Id.,* ¶ 22, subd. (f).) MCM did not protest Myers's bid in the manner or in the time provided by the instructions. MCM apparently left it to MK to protest Myers's bid.[12]

MCM thereafter pursued only the rejection of its own bid. It argued that its bid was responsive and that the Airport should award it the contract. Correspondence between the Airport, MCM, and MK also demonstrates that the Airport and the parties viewed MK as the only party challenging Myers's bid.

The first time MCM raised any challenge to Myers's bid was in connection with the May 6, 1997, hearing of the Airport commission to act on the

---

[11]Paragraph 22 of the bid instructions provides:

"22. Any bid protest must be submitted in writing to Deputy Director - Bureau of Design and Construction, San Francisco International Airport, P.O. Box 8097, San Francisco, CA 94128 before 5 pm of the 10th business day following bid opening.

"a. The initial protest document shall contain a complete statement of the basis for the protest.

"b. The protest shall refer to the specific portion of the document which forms the basis for the protest.

"c. The protest shall include the name, address and telephone number of the person representing the protesting party.

"d. The party filing the protest shall concurrently transmit a copy of the initial protest document and any attached documentation to all other parties with a direct financial interest which may be adversely affected by the outcome of the protest. Such parties shall include all other Bidders or proposers who appear to have a reasonable prospect of receiving an award depending upon the outcome of the protest.

"e. The Commission will issue a decision on the protest. If the Commission determines that a protest is frivolous, the party originating the protest may be determined to be irresponsible and that party may be determined to be ineligible for future contract awards.

"f. The procedure and time limits set forth in this paragraph are mandatory and are the Bidder's sole and exclusive remedy in the event of Bid protest and failure to comply with these procedures shall constitute a waiver of any right to further pursue the bid protest, including filing a Government Code Claim or legal proceedings."

[12]This may have been a considered attempt by MCM to avoid the pitfalls of paragraph 22, subdivision (e), of the invitation to bid, which provided that a party originating a frivolous protest could be determined ineligible for future contract awards.

staff recommendation that the contract be awarded to Myers.[13] By letter dated May 5, 1997, counsel for MCM for the first time argued that it was "unfair and illogical to award to Myers . . . ." In this letter, MCM argued that the City could not waive Myers's deviation from strict bidding requirements, yet enforce the same requirements against MCM. Even in this context it is not clear that MCM was protesting Myers's bid, so much as it was arguing the unfairness in holding MCM to the letter of the bid instructions, while agreeing to waive deviations by Myers.

MCM contends that protest requirements are in the nature of a forfeiture and are never enforced absent actual prejudice. Because Myers's bid was duly protested by MK and because the City considered this protest on its merits, MCM argues no one was prejudiced by its failure to protest Myers's bid. MCM also contends that "Only substantial compliance with the protest provisions is required, which was fulfilled by the timely protest of Myers' bid *by MK.*" (Italics added.) Finally, MCM contends the City waived any failure on the part of MCM to strictly comply with bid protest requirements by considering the protest to Myers's bid on its merits.

MCM relies upon a faulty premise and inapplicable authorities.

There is no indication the Airport "waived" its requirements regarding the proper method for protesting a bid. Indeed, the resolution adopted by the commission awarding the contract to Myers refers to the bid protests in the plural when referencing all bid protests (including protests of the Harris, MCM, and Myers bids), but refers in the singular to its rejection of "the bid *protest* with regard to the Myers . . . bid as being without merit. . . ." (Airport Com. Res. No. 97-0119, italics added.) This is obviously a reference to the single protest filed by MK. There is no indication in the administrative record that the City intended to or in fact did waive its right to enforce its bid protest procedures. In the superior court mandamus action

---

[13]At the hearing, counsel for MCM argued first that its bid met the WBE and MBE goals and that controlling state law did not require listing subcontractor bid amounts. He continued: "Moreover, Myers/Kulchin Condon's bid listed in envelope B was not complete, as Mr. Gire stated. You are including within Myers' bid information about a 3 million dollar subcontract that had to be, per your bid instructions, in envelope B. It wasn't there in Myers' bid package. [¶] Now, I don't understand why the Airport Commission is waiving that irregularity when it is strictly enforcing the instructions 'to bidders as to MCM. [¶] The basic purpose of competitive bidding is that we have a level playing field. And here the commission is thinking about waiving this huge problem with Myers' bid, which is 2 million dollars higher than ours, and enforcing various minor deviations in MCM's bid." At other points in the hearing, counsel reiterated its argument that it was unfair to enforce its instructions against MCM, while waiving Myers's deviation.

the City continued to assert that MCM waived its right to challenge the award to Myers because it had not submitted a bid protest pursuant to paragraph 22 of the bid instructions for the contract.

That MK timely protested Myers's bid does not have any bearing upon whether MCM strictly or even "substantially" complied with the procedures established by the invitation to bid. Nor does *Milovich* v. *City of Los Angeles* (1941) 42 Cal.App.2d 364 [108 P.2d 960] support MCM's argument that "substantial compliance" with the protest requirements was fulfilled by MK's filing of its protest. In *Milovich*, the plaintiff sought damages for breach of a contract with the Los Angeles Department of Public Works (which the Board of Water and Power had executed in the name of the department.) The city charter required claims against the city to be presented to the board, officer or employee authorized to incur the expenditure, which the city claimed was the Board of Water and Power commissioners. The plaintiff, pursuant to provisions of the contract, filed his complaint with the chief engineer and manager of the Bureau of Water Works and Supply of the Department of Water and Power. The plaintiff was notified that the claim had been rejected, by a writing on the letterhead of the Department of Water and Power. The court affirmed the trial court's finding that the Board of Water and Power commissioners, who signed the contract for and in behalf of the Department of Water and Power, acted upon and rejected the claim. (*Id.*, at p. 372.) Consequently, the appellate court held that the plaintiff had "complied substantially" with the provisions of the City charter. The plaintiff had made a "bona fide attempt to comply with the law" by submitting the claim to the chief engineer and general manager of the contracting department. (*Ibid.*)

*Milovich* itself serves to highlight the insufficiency of MCM's claim of substantial compliance. The plaintiff in *Milovich* promptly filed his claim against the public entity. He did not assert, as MCM does here, that the challenge of another entity relieved him of any duty to file his own claim. Further, the plaintiff in *Milovich* complied with the provisions of the contract concerning filing of claims. No remotely similar efforts toward "substantial compliance" were made by MCM in this case.

Finally, those cases cited by MCM for the proposition that "court's [*sic*] never enforce such protest requirements in the absence of actual prejudice" are inapposite. In *Blair Excavators, Inc.* v. *Paschen Contractors Inc.* (1992) 9 Cal.App.4th 1815 [12 Cal.Rptr.2d 420], a subcontractor on a public project gave statutory notices to the general subcontractor of its claim for payment against another subcontractor, sending a preliminary bond notice pursuant

to the Civil Code which stated the claim was about $200,000. Thereafter, the trial court allowed the subcontractor to prove damages according to the reasonable value of services—$335,000. (*Id.*, at p. 1818.) On appeal, this court held that in the absence of prejudice, the amount stated in the preliminary bond notice does not limit the amount of recovery. The only issue in *Blair* was whether the "substantial accuracy" requirements of the mechanics lien statutes could be applied to limit the amount of recovery to that set forth in the 90-day notice. We held the statute referred to the claim itself and not the amount. (*Ibid.*) The claim in the bond notice had been stated with "substantial accuracy" as required by the Civil Code, and the statutory remedies enacting mechanics' liens are liberally construed to provide adequate compensation for those providing materials or services to public works projects. (*Id.*, at pp. 1818-1820.) Such considerations are not present here, where MCM failed to protest the bid as required by the bid invitation. Certainly, even in the mechanics' lien context, the subcontractor would not have been *relieved* of the requirement that it provide the required statutory notices.

*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 759-762 [15 Cal.Rptr.2d 815] is also inapposite. That case involved an insured's alleged failure to give timely notice to the insurer of claims against the insured. "California law is settled that a defense based on an insured's failure to give timely notice requires the insurer to prove that it suffered substantial prejudice. [Citations.]" (*Id.*, at p. 760.) MCM attempts to take this rule from the insurance context and to make it a doctrine of general application. We resist such attempt to expand doctrines developed in the insurance context, with its solicitude for the rights of the insured and its particularized concerns for the special relationship between insurer and insured.

We are unpersuaded in this public contracting context that MCM may disregard entirely the requirements set forth in the invitation to bid for protesting the bids of other contractors, but may nevertheless belatedly challenge that bid in the courts. As one program handbook warns bidders, "Most bid protests are brought by unsuccessful bidders (typically the second lowest prime contractor . . .) after the public agency or staff has indicated its intent to award the contract. In fact, if the contractor does not immediately lodge a protest in writing to the public entity, the bid protest right may be waived." (Brown, Public Works: Contracts and Litigation (Cont.Ed.Bar

1995) Program Handbook, p. 76.) We are convinced MCM has waived its right to protest Myers's bid.[14]

## CONCLUSION

The judgment of the superior court denying the writ of mandate is affirmed. Respondents shall recover their costs on appeal.

Haerle, J., and Lambden, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 21, 1998.

---

[14]Having determined that MCM waived its right to protest Myers's bid, we need not address the question of MCM's standing to challenge Myers's bid or the merits of MCM's challenge to City's award of the contract to Myers.