[No. E025915. Fourth Dist., Div. Two. June 29, 2000.]

GEORGE CLIFFORD BAKER, Plaintiff and Respondent, v.
STEVEN GOURLEY, as Director, etc., Defendant and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Silvia M. Diaz and Zachary D. Wechsler, Deputy Attorneys General, for Defendant and Appellant.

Allen & Ehrle and T. Douglas Allen for Plaintiff and Respondent.

OPINION

**HOLLENHORST, Acting P. J.**—The Director of the Department of Motor Vehicles (herein DMV), appeals from the judgment of the superior court granting George Clifford Baker's (herein Baker) petition for alternative writ of mandamus requiring the DMV to set aside its order suspending Baker's driver's license.

### PROCEDURAL BACKGROUND AND FACTS

On January 10, 1999, at approximately 1:47 a.m., Baker was observed by Officer Mark Wilson of the Upland Police Department, driving his truck 60 miles per hour in a 40 miles per hour speed limit zone. "The truck swerved when turning [and] straddled the #1 [and] #2 lanes of Central in vio[lation of Vehicle Code, section] 21658[, subdivision (a)]." After stopping Baker in his truck, Officer Wilson noticed objective symptoms of intoxication including bloodshot and watery eyes, the odor of an alcoholic beverage, an unsteady gait, slurred speech, impaired balance and coordination, and divided attention. Baker was placed under arrest at 2:09 a.m. He was issued a temporary driver's license pursuant to Vehicle Code sections 13353 and 13353.2. According to the County of San Bernardino Sheriff's Department Laboratory of Criminalistics, Blood Alcohol Report (herein BA Report), which is identified as "LRB # 99010233," Baker's blood sample was drawn in Officer Wilson's presence by technician Macias.

The bottom half of the BA Report is labeled "CHAIN OF POSSESSION OF SAMPLE." It indicates that Macias gave Baker's blood sample to Officer Wilson at 3:35 a.m. on January 11, 1999. The next entry indicates an individual named "Poles" retrieved the sample from storage locker "A-1" at 8:00 a.m.[1] Poles delivered Baker's blood sample to the laboratory on

---

[1]Although the DMV suggests that it is unclear whether this time was a.m. or p.m., we note the use of military time "0800." Accordingly, the time was a.m.

January 12, at 9:30 a.m.[2] The BA Report bears a notation indicating the "Seal [was] cut by: [initials unclear]," on January 12, 1999, at 9:50 a.m.[3] There is an identification number, "BA #" 122418 (herein referred to as BA 122418 or B122418) at the bottom of the page. There was, however, no evidence that the vial containing the blood sample was ever opened or that the sample ever left the custody and control of the laboratory where it was ultimately tested.

On January 18, 1999, Baker's blood sample was analyzed by a technician of the San Bernardino Sheriff's Department, Scientific Investigations Division, identified as "Schneider." Baker's blood-alcohol content (herein BAC) is listed as 0.09 percent. Although Baker's name, LRB # 99010233 and "kit # B122418" match those attached to Officer Witson's report (and chain of possession of sample document), Baker's date of birth is mistakenly listed as "03081959" instead of the correct date of "05081959."[4]

At the administrative hearing, the DMV admitted the following documentary evidence: exhibit 1—Officer Wilson's sworn statement; exhibit 2—DUI (driving under the influence) arrest/investigation report; exhibit 3—order of suspension with a temporary license endorsement; exhibit 4—Baker's driving record; exhibit 5—correspondence between Baker's counsel and the DMV; exhibit 6—Baker's application for a subpoena duces tecum and a copy of the subpoena duces tecum issued to the West Valley Crime Lab. Baker did not object to exhibits 3 through 6, inclusive. Instead, Baker's primary concern was with the chain of custody of the blood sample, exhibit 2. His expert, Henry S. Greenberg, reviewed the discovery given to him by Baker's counsel. Based on the documents he reviewed, Mr. Greenberg concluded that the DMV did not comply with the requirements of California Code of Regulations, title 17, section 1219 (herein sometimes referred to as Title 17).

Specifically, Mr. Greenberg noted the blood sample was collected by a person named Macias on January 10, 1999, at 3:35 a.m. He interpreted the exhibit as indicating Officer Wilson witnessed the drawing of the sample. Mr. Greenberg testified that according to his review of the "CHAIN OF POSSESSION OF SAMPLE," an individual named "Poles" received the sample from locker A-1 on January 11, 1999, at approximately 8:00 a.m. "Poles

---

[2] Once again, the use of military time, i.e., 0930, tells us that it was delivered in the morning at 9:30 a.m. Although the DMV contends it is unclear whether it was delivered at 9:30 or 4:30, we disagree. If it had been delivered at 4:30 p.m., the notation would have read 1630.

[3] The initials are unclear, and the notation indicating the time the seal was cut is not very legible.

[4] This error was corrected by a revised report dated February 4, 1999, indicating a revision "as to Date of Birth only."

delivered the sample to the crime lab 25 hours, 25 and a half hours after he or she received it on January 12th." Once the sample was in the laboratory, Mr. Greenberg testified someone (whose initials he could not read) opened a seal. However, he was unsure at exactly what time this was done.

Based upon the first two pages of exhibit 2, Mr. Greenberg concluded that analyst Schneider analyzed the sample on January 18, 1999, six days after the seal was cut. According to Mr. Greenberg, "[w]hat we have here is a breakdown in the chain of custody, the integrity, the whereabouts of the sample for the six days between the time the sample was opened, . . . or where the evidence seal was broken, when [sic] the time Schneider analyzed it." Thus, Mr. Greenberg opined that "we have . . . a document in violation of [title 17, s]ection 1219, general, which requires the . . . maintenance of the integrity and chain of custody, from collection, through analysis, to reporting." After considering all the evidence introduced at the administrative hearing, the hearing officer found that the suspension of Baker's driver's license was proper.

Baker petitioned for judicial review under Vehicle Code section 13559. He contended the DMV's findings were not supported by the evidence because the testimony of Mr. Greenberg was sufficient to rebut the evidentiary presumption in Evidence Code section 664, such that the reliability of the blood-alcohol test was called into question. At trial, the DMV disputed Baker's claim by arguing that Baker failed to produce any evidence which showed that the officers or laboratory employees deviated in any way from the regular performance of their official duties.

In response to the court's inquiry regarding the evidence that the seal had been cut, the DMV noted that "Title 17 does not require that . . . a test be done within a certain time of the seal being cut. . . . Once the sample is in the lab's possession, [it is] presume[d] it's been correctly handled unless the Petitioner can establish . . . affirmative evidence showing otherwise." Baker replied that the "documents themselves establish there has been a violation of Title 17" because the six-day window between the cutting of the seal and the analysis interrupted the chain of custody and rebutted the presumption of regularity. Thus, Baker claimed that as long as he could show official standards were in any way violated, the burden shifts back to the DMV to explain why this six-day window did not corrupt the sample.

According to the DMV, Title 17 does not require a seal to be cut by the person performing the analysis. The DMV noted that the chain of custody document does not indicate whether the seal that was cut was the seal to the

pouch carrying the sample or to the sample itself.[5] Finally the DMV objected to Baker's characterization of Mr. Greenberg's testimony as "undisputed." Instead, the DMV faulted Mr. Greenberg's testimony as being a legal conclusion that Title 17 was violated despite the fact that he was unable to point to any specific violation of Title 17. Thus, the DMV contended that the presumption that the official business had been regularly performed was not rebutted; thus, the burden of proof remained with Baker. The trial court took the matter under submission.

On August 2, 1999, the trial court issued its ruling wherein it granted Baker's petition and entered judgment in his favor. The DMV appeals. Neither party disputes the facts. Instead, the sole issue on appeal is whether Mr. Greenberg's testimony rebutted the reliability of the blood-alcohol test such that there was insufficient evidence to support the hearing officer's decision.

## STANDARD OF REVIEW

██ In ruling on Baker's petition for writ of mandate, the trial court was required to determine, by exercising its independent judgment, whether the hearing officer's decision was supported by the weight of the evidence. (Code Civ. Proc., § 1094.5, subd. (c); *Lake v. Reed* (1997) 16 Cal.4th 448, 456 [65 Cal.Rptr.2d 860, 940 P.2d 311]; *McKinney v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 519, 523 [7 Cal.Rptr.2d 18]; *Coombs v. Pierce* (1991) 1 Cal.App.4th 568, 575-576 [2 Cal.Rptr.2d 249].) "When the trial court is authorized to exercise independent judgment on the evidence, on appeal [we] need only review the record to determine whether substantial evidence supports the trial court's findings. [Citations.]" (*Coombs v. Pierce, supra*, 1 Cal.App.4th at p. 576; *Lake v. Reed, supra*, 16 Cal.4th at p. 457.)

## THE EVIDENCE

██ According to Evidence Code section 664, there is a rebuttable presumption that an official duty has been regularly performed. For example, once the DMV presents competent evidence in the form of documents contemplated in the statutory scheme to establish its prima facie case, the licensee must produce competent affirmative evidence of the nonexistence of the presumed facts sufficient to shift the burden of proof back to the DMV. (Cf. *Jackson v. Department of Motor Vehicles* (1994) 22 Cal.App.4th 730, 739 [27 Cal.Rptr.2d 712].) The licensee must show, "through cross-examination of the officer or by the introduction of affirmative evidence, that

[5]The samples must be enclosed in vials, sealed with an inert stopper. (Cal. Code Regs., tit. 17, art. 5, § 1219.1, subd. (e).)

official standards were in any respect not observed . . . ." (*Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 144 [7 Cal.Rptr.2d 818].) Once such showing has been made, the burden shifts to the DMV to prove that the test was reliable despite the violation. (*Ibid.*)

▇ In the instant case, Evidence Code section 664 places upon Baker the burden of proving the nonexistence of the foundational trustworthiness of the BA report, and specifically, the nonexistence of the foundational reliability of the tests. Baker contends that he met this burden by offering the testimony of Mr. Greenberg who opined that the integrity of the blood sample had been compromised when its seal had been cut some six days before it was tested. We disagree.

California Code of Regulations, title 17, section 1219 (herein Section 1219) provides, "Samples taken for forensic alcohol analysis and breath alcohol analysis shall be collected and handled in a manner approved by the Department. The identity and integrity of the samples shall be maintained through collection to analysis and reporting." Section 1219.1 of Title 17 (herein Section 1219.1), in relevant part, provides, "(e) The blood sample shall be deposited into a clean, dry container which is closed with an inert stopper. [¶] . . . [¶] (g) In order to allow for analysis by the defendant, the remaining portion of the sample shall be retained for one year after the date of collection."

As the DMV points out, there are no specific requirements which deal with the cutting of a seal or the lapse of time[6] in testing. Nothing in the administrative record suggests a violation of the procedures set forth in Section 1219.1. Nonetheless, the trial court found Mr. Greenberg's testimony dispositive on the issue. Turning to Mr. Greenberg's testimony, we are unable to find substantial evidence to support the trial court's findings. According to Mr. Greenberg, "[W]hat we have is . . . a document in violation of Section 1219, general, which requires the . . . maintenance of

---

[6]Instead, the only reference to time is in section 1219.1, subdivision (g), which requires the DMV to retain the remaining portion of the sample for one year after the date of collection in the event the licensee wishes to have an independent test performed. This subdivision refutes Mr. Greenberg's unsupported assertion that the person who receives the sample for analysis is the person who is supposed to cut the seal. If we were to give any meaning to this bold assertion, we would render subdivision (g) meaningless. As the DMV points out, "Were the cutting of the seal of a vial which is already within the confines of a laboratory to start the running of an arbitrary clock, so that a blood sample could only be tested by the *same* person who initially cut the seal, and then only tested only hours or minutes after the seal was cut, Section 1219.1, subdivision (g) . . . would be rendered nonsensical or meaningless. . . . If such purported requirements were the litmus test to insure a blood sample's integrity, any samples on which tests were performed pursuant to . . . Section 1219.1[, subdivision ] (g) in the days, weeks and months after such sample was originally tested would, under [Mr. Greenberg's] analysis, necessarily lack integrity and be of no evidentiary value."

the integrity and chain of custody, from collection, through analysis, to reporting." However, nothing in section 1219 or 1219.1 requires a chain of custody document. In order to rebut the Evidence Code section 664 presumption, Baker must show that cutting the seal six days prior to testing the sample resulted in compromising the integrity of the sample. While the chain of custody document indicates that the sample was tested some six days after the "seal" was cut, there is no evidence that the official standards were not observed such that the sample itself was tampered with or compromised. As the DMV correctly notes, because "the purported 'flaw' does not break the chain of custody at all, there can be *no reasonable basis* for inferring that the blood sample was somehow contaminated or tainted."

Also, we reject the trial court's conclusion that the sample was further compromised because the individual who cut the seal was not the same person who performed the analysis. The chain of custody document clearly indicates that someone in the crime lab cut the seal on January 12, 1999. Nothing in the record suggests that the person who cut the seal did not have the authority to do so. Moreover, we note that there is no evidence which demonstrates that the cutting of the seal was the equivalent of opening the sample. As such, there is no evidence that the vial was opened or that the contents of the vial were mixed with any other ingredient. Thus, the record shows no more than a mere possibility that the integrity of the sample was not maintained. Such speculation is insufficient to support a reasonable inference that the integrity of the sample was, in fact, compromised.

For the reasons stated herein, we conclude that the trial court's findings are not supported by substantial evidence and reasonable inferences.[7]

### DISPOSITION

The trial court's judgment granting Baker's petition for writ of mandate is reversed. The trial court is directed to issue a new order denying Baker's petition. Baker shall pay DMV's costs on appeal.

McKinster, J., and Richli, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 30, 2000.

---

[7]In light of our conclusion, it is unnecessary to address the DMV's second basis for reversal, i.e., that the record contained substantial circumstantial evidence that Baker was driving with a BAC of 0.08 percent by body weight.