Filed 2/15/24  Lunday-Thagard Co. v. City of Los Angeles CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LUNDAY-THAGARD COMPANY dba WORLD OIL REFINING,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>Defendant and Appellant. | B307777<br><br>(Los Angeles County Super. Ct. No. 19STCP01684) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, James Chalfant, Judge.  Affirmed in part and reversed in part with directions.

Michael N. Feuer and Hydee Feldstein Soto, City Attorneys, Denise C. Mills, Chief Deputy City Attorney, Scott Marcus, Chief Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney, and Michael M. Walsh, Deputy City Attorney, for Defendant and Appellant.

Jeffer, Mangels, Butler & Mitchell, Benjamin M. Reznik and Mark Riera for Plaintiff and Appellant.

———————————————

The City of Los Angeles (City) owns and operates asphalt plants that manufacture asphalt concrete to pave and repair the City's streets. In 2018, the City sought bids on a contract to supply it with asphalt binder, an ingredient of asphalt concrete. The City received two bids—from San Joaquin Refining Co., Inc. (SJR) and Lunday-Thagard Company dba World Oil Refining (LTC). The City awarded the contract to SJR after concluding that LTC's asphalt binder did not conform to the City's specifications.

LTC filed a petition for writ of mandate to compel the City to vacate the contract award to SJR and award the contract to LTC. LTC urged that it was the lowest monetary bidder, its asphalt binder substantially complied with the bid specifications, and SJR's bid did not comply with the specifications. LTC further urged that the City showed repeated and transparent favoritism to SJR, which had supplied asphalt binder to the City for the previous 25 years.

The trial court found that LTC's binder did not substantially comply with the bid specifications and the City did not favor SJR. It therefore concluded that LTC was not entitled to the contract award. The court further concluded, however, that the City erred in awarding the contract to SJR because SJR's bid also materially failed to comply with the bid specifications. The court therefore issued a judgment directing the issuance of a writ of mandate requiring the City to vacate its

2

award of the contract to SJR, and it subsequently denied LTC's motion for attorney fees.  Both the City and LTC appealed from the judgment granting the writ, and LTC appealed from the order denying its motion for attorney fees.

We conclude that the trial court erred by ordering the City to vacate the contract award to SJR.  SJR's asphalt binder fully complied with the bid specifications, and although there were some errors in its bid submission, those errors were not material. In contrast, LTC's binder did not comply with the bid specifications, and substantial evidence supported the City's conclusion that the deviation was material.  Accordingly, we reverse the judgment insofar as it directed issuance of a writ of mandate requiring the City to vacate the contract award to SJR, and otherwise affirm.  We further affirm the order denying LTC's motion for attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Background.

The City owns and operates asphalt plants in Los Angeles and North Hollywood that manufacture asphalt concrete to pave and repair the City's approximately 28,000 lane miles of paved streets.  To supply these plants, the City purchases asphalt binder, a petroleum-based material that holds aggregate together to create asphalt concrete.  Asphalt binder is viscous at high temperatures but is an elastic solid at lower temperatures.

The Supply Chain Services Division (Supply Division) of the City's Department of General Services fulfills the City's procurement needs.  The Roads and Highways Section of the City's Standards Division develops standards for City-purchased paving materials and for testing construction and engineering

3

materials. It also operates materials testing labs certified by the American Association of State Transportation and Highway Officials (AASTHO) with regularly calibrated equipment. Those labs perform approximately 148,000 tests per year in support of the City's Pavement Preservation Program, which maintains City roads and highways. Specifically, the City's Asphalt Concrete Lab analyzes asphalt concrete manufactured by the City internally or purchased from third parties by verifying the amount of asphalt binder mixed with the aggregate, testing the asphalt concrete to ensure it meets the City's standards, and conducting field tests of paved streets. Separately, the City's Asphalt Binder Lab analyzes asphalt binder and conducts tests to ensure that the asphalt binder meets the City's performance standards and specifications. The lab conducts numerous tests to determine the rheological characteristics of the binder at high and low temperatures and the binder's resistance to deformation.[1]

Since about the early 1990's, the City has purchased asphalt binder from SJR. Before the present dispute, SJR provided asphalt binder to the City under a contract executed in 2011 that expired in January 2019.

---

[1]    Rheology is the branch of science that deals with the deformation and flow of matter, especially the flow of liquids and the plastic flow of solids. (<https://www.oed.com/search/dictionary/?scope=Entries&q=rheology> [as of Feb. 15, 2024], archived at <https://perma.cc/A5FP-Q5HH>.)

4

## II. The 2018 request for quotation.

In November 2018, the City issued a request for quotation (RFQ)[2] for two kinds of asphalt binder:  one for use on roads with light traffic volume such as residential streets (light binder), and the other for use on roads with higher traffic volume, including bus and truck traffic (medium binder).[3]  The initial bid submission date was December 18, 2018.  The relevant portions of the RFQ are as follows:

*Contract period*:  Bids were requested for furnishing "the annual requirements of the City" from January 1, 2019 (or the contract award date) through December 31, 2020.  The City reserved the right to renew the contract for five additional one-year periods on the same terms and conditions as the original contract and to terminate the contract "for [the City's] convenience."

*Bids accepted only from manufacturers*:  "[T]o ensure that [the City] receives a uniform quality and an uninterrupted supply of the delivered product, bids will be considered only from those firms who are actual producers, or manufactur[ers] of [asphalt binder] of the grades specified."

*Technical specifications*:  Bids "shall meet the . . . technological and performance requirements" specified in an attachment to the RFQ.  The attachment specified the values

---

[2]      The RFQ is sometimes referred to as a request for bid (RFB).

[3]      The RFQ contained seven line items.  The first five requested specific light and medium asphalt binders to be delivered to the City's two asphalt plants, and the last two line items addressed an oil spill recovery fee and hauling charges.

within which the binder was required to perform on nine tests, including of rotational viscosity, stiffness, flash point, and dynamic shear.

*Product samples*:  "Prior to bid close date bidders will be required to submit 1 gallon container sample of product(s) quoted for evaluation . . . .  [¶]  Failure to submit sample 14 days (excluding holidays and weekends) prior to bid opening . . . will cause your Quotation to be deemed non-responsive."

*Selection criteria*:  The City was permitted to make a combined award of all items completely to one bidder or may award separate items or groups of items to various bidders.  The award "will be to the bidder(s) deemed to offer the material and/or service at the lowest bid price, lowest ultimate cost, or best overall value to the City based on responsive quotation(s) meeting the specifications set forth in the RFQ."

*Deviations from City's specifications*:  "Quotations will be considered for . . . materials deviating from the specifications if such products comply substantially with the specifications," but each deviation "must be stated in a letter attached to your quotation."  Failure to submit or disclose deviations from the specifications "will make your Quotation non-responsive."

*City discretion to determine compliance and to waive administrative irregularities:*  The City reserved the right, at its sole discretion, "to waive minor administrative irregularities contained in any Quotation," "to reject any or all Quotations," and "to reject unapproved alternate Quotations."  The City "shall be the sole determiner of substantial compliance with the specifications."

*Business Inclusion Program (BIP) mandatory outreach*:  "It is the policy of the City of Los Angeles to provide [businesses

6

owned by underrepresented groups (BIP contractors)] an equal opportunity to participate in the performance of City contracts. Bidders shall assist the City in implementing this policy by taking all reasonable steps to ensure that all available business enterprises, including [BIP contractors] have an equal opportunity to compete for and participate in City contracts. . . . [F]ailure to complete the Outreach as directed in the BIP Requirements will render the bid non-responsive and will result in its rejection."

*Mandatory pre-bid meeting*: "A Mandatory Pre-Bid meeting will be held to receive questions from prospective bidders regarding the RFQ/RFB, and for prospective bidders to obtain additional information regarding the City's contracting and legislated compliance requirements." An employee of the bidder's company "must attend the pre-bid meeting scheduled for this project."[4]

## III. Pre-bid meeting, RFQ amendments, and bid submissions.

Two potential bidders, LTC and Horizons Construction Company, attended the pre-bid meeting on November 27, 2018. SJR's asphalt marketing manager, Steve Hollis, contacted the City to ask whether the meeting could be postponed because he had injured his back and would not be able to attend. A city representative told Hollis the meeting could not be postponed, and thus no SJR representative was at the meeting.

---

[4]     The City contends, and LTC does not dispute, that the only reason the pre-bid meeting was mandatory was to satisfy the BIP requirements.

7

At the November 27 meeting, LTC's representative, Austin Miller, asked why BIP outreach was required when the RFQ required bidders to manufacture the asphalt binder themselves, not to purchase it from subcontractors. City Procurement Analyst Daisy Curaming communicated this question to her supervisors, who agreed that BIP outreach was not appropriate for this contract. The City therefore asked the mayor's officer to waive the BIP outreach requirement, and the mayor's office agreed to do so on December 5, 2018.

The City issued two addenda to the RFQ. On December 3, 2018, it issued Addendum No. 1, which extended the bid closing date nine days, from December 18, 2018 to December 27, 2018. The extension of the bid closing date also extended the deadlines for submitting product samples. On December 6, 2018, after receiving approval from the mayor's office, the City issued Addendum No. 2, which waived mandatory BIP outreach, including attendance at the pre-bid meeting.

Only SJR and LTC submitted bids and product samples to the City. SJR bid on all seven contract line items but submitted its samples six days late, on December 12, 2018. LTC submitted its sample on time, but it bid only on line items 2, 4, 6, and 7 (medium binder, oil spill recovery fee, and hauling charges). LTC bid $7,956,000 on line items 2, 4, 6, and 7, and SJR bid $7,331,894 on line items 1 through 7.

SJR's samples passed all required tests and met the City's specifications and performance requirements. LTC's sample failed the dynamic shear rheometer (DSR) test, which measured the sample's ability to withstand rutting and other pavement

deterioration.[5]  Specifically, the City's specifications required that the medium binder have a rutting resistance parameter between 1.50 and 3.00 kilopascals (kPa), and LTC's binder tested below that range at 1.47 kPa.  LTC did not disclose this deviation from the specifications or request a modification of the specifications, and the City deemed the failure a material deviation after twice retesting the sample to verify the DSR values.  In comparison, SJR's sample measured 2.00 kPa on the DSR test.

LTC's and SJR's bids both contained administrative errors the City deemed inconsequential.  Specifically, neither party provided the correct corporate signatures; LTC priced its bid based on a December 2018 price index, rather than a January 2019 index; and SJR submitted two incomplete forms.

## IV.    Contract award; LTC's protest and request for appeal.

On December 28, 2018, the Supply Division emailed a summary of the submitted bids to the Roads and Highways Section and the Bureau of Street Services.  The summary noted that LTC bid only on the medium binder and its sample did not pass the performance standards test, while SJR bid on all line items and its sample passed all required tests.  The Supply Division therefore recommended that SJR be awarded the contract.  On February 1, 2019, the City awarded SJR the contract.

LTC protested the award and requested an appeal hearing. The City denied LTC's request for an appeal but met with LTC's

---

[5]    A dynamic shear rheometer, or DSR, is a machine that tests asphalt binders' resistance to deformation by placing the binders under repeated stress at various temperatures.

9

attorneys to discuss the City's analysis of the bid pricing. LTC contended the City's pricing calculations were incorrect because LTC's bid was based on a December 2018 index and SJR's bid was based on a January 2019 index; if the City applied the January 2019 index to LTC's bid, its bid was lower than SJR's. LTC also contended the City's specifications for the medium binder were too restrictive, and SJR's bid was noncompliant because it had not attended the pre-bid meeting or timely submitted binder samples.

The Supply Division determined that LTC's claims had sufficient merit to reopen the bidding. LTC rejected the rebid and requested that it be awarded the contract.

The City conducted further internal meetings and ultimately concluded that the price difference between LTC's and SJR's bids was irrelevant because LTC's product did not comply with the City's specifications. It advised LTC that several of its contentions had merit—namely, SJR submitted its samples late, and LTC's bid price was lower when calculated using the proper index. However, the City disagreed that its specifications were unduly restrictive, noting that they were "based on the City's needs and [have] been the basis for the City's minimum [asphalt binder requirements] for the last twenty-five years." Further, the City said Addendum No. 2 eliminated the pre-bid meeting requirement, and the City deemed SJR's late sample submission a minor administrative deviation that it waived for the City's benefit. In short, although LTC "may have offered the lowest monetary price" on medium binder, LTC's bid "did not meet the minimum specifications set forth in the solicitation and is still deemed non-responsive." Therefore, "upon reconsideration of all

10

the information that has been brought to light, the City will not take any additional recourse."

## V.    LTC's writ petition.

LTC filed a petition for writ of mandate to have the award to SJR set aside and the contract awarded to LTC.  LTC also asserted causes of action for promissory estoppel, ultra vires acts, and declaratory relief.

LTC's opening brief contended that its product sample materially complied with the bid specifications because it passed all performance tests except the DSR test, which it failed only trivially.  Further, the City was required to reject SJR's bid because SJR failed to attend the mandatory pre-bid meeting, submitted its samples after the deadline, and submitted two incomplete forms.  LTC therefore requested that the court vacate the award to SJR and direct award of the contract to LTC.

In support of its petition, LTC submitted the declaration of Dr. Gary Hicks, who opined that LTC's product sample substantially complied with the City's requirements because the difference between 1.47 and 1.50 kPa on the DSR test was negligible and would not impact the binder's performance. LTC also submitted the declaration of the owner of an independent testing laboratory who opined:  "[DSR] test results by a single operator using the same equipment within 6.4% of one another are not considered suspect. . . . [¶] . . .  Accordingly the estimated precision of any two DSR tests performed . . . is at best 6.4%.  Here, [LTC's] product sample testing l.47/1.50 G*/SIN0 (kPa) is well within the expected variation of precision built into the [applicable] test."

11

## VI.    City's opposition to writ petition.

The City and SJR opposed LTC's writ petition.  The City contended that LTC's bid was nonresponsive because its sample did not meet the City's specifications and its bid did not disclose the deviation.  Further, while SJR's bid contained minor irregularities and administrative errors—namely, SJR submitted its product samples late, and its bid packet was missing two corporate signatures and included two incomplete forms—these were minor administrative errors that the City waived for its benefit.  The City urged the trial court to deny the writ petition because substantial evidence supported the City's determination that LTC's bid was nonresponsive, and the award of the contract to SJR complied with the City's charter and administrative code.

In opposition to the writ petition, the City submitted the declaration of Ricardo Villacorta, head of the Roads and Highways Section, who said that the City deemed LTC's failure to meet the DSR requirement a material deviation from the specifications.  Villacorta explained:  "RHS [Roads and Highways Section] developed the Specification based on extensive testing, research, data, experience with local materials, and knowledge of what the City needs to manufacture durable and long-lasting asphalt concrete that can withstand the City's particular loads and traffic conditions. . . .  [¶]  The difference of G*/Sin (δ) [the rutting resistance parameter] between 1.47 kPa and 1.50 kPa may seem small numerically, but the deviation is significant for determining the material's resistance to permanent deformation, rutting and other forms of deterioration.  RHS established specified ranges in the Specification to allow test results to deviate a certain amount above and below a target value.  The target DSR value for . . . medium binder is not 1.50 kPa, which is

12

the minimum value at which a binder will be considered. The edges of the range (1.50kPa and 3.00kPa) represent the maximum distance away from the target value, beyond which the City can no longer accept test results. [¶] Based on RHS's extensive research, testing and experience, the use of LTC's asphalt binder would result in rutting and increased incidents of pavement deformation leading to overall shorter pavement lifespan. This deviation would result in more frequent pavement repairs and construction, and the use of the binder would reduce public safety because rutting and deformations can cause an increase in traffic accidents."

Villacorta further declared that the City did not consider SJR's late delivery of its binder sample to be a material deviation from the specifications. He explained that the RFQ required bidders to provide product samples at least fourteen days (excluding weekends and holidays) before the bid closing date to give the City enough time to complete tests even if many companies submitted bids and samples. Because the City received samples from only LTC and SJR, it was able to test all samples well prior to the bid closing date.

Villacorta recommended that the contract be awarded to SJR because LTC bid on only the medium binder and its sample did not meet the specifications, while SJR bid on both the light and medium binder, its samples passed all performance tests, and SJR had been a reliable supplier of binders meeting the City's specifications.

Melissa Yusilon, Director of the Supply Chain Division, stated in a declaration that City contracts are awarded to the lowest responsive and responsible bidder. A "responsive" bidder is one whose bid fully conforms in all material aspects to all bid

13

requirements, and a "responsible" bidder is one who is fully capable of meeting all the requirements of the bid and subsequent award. Bids are analyzed using the methods set forth in the City Charter—namely, price analysis, cost analysis, and/or product life-cycle analysis. The City reserves the right to award a contract to the lowest responsive and responsible bidder either as a whole or by line item if a split award will result in a significant cost savings. Typically, the City will split a contract between two bidders only if the cost savings is at least 15 percent or $15,000, whichever is greater.

## VII. Trial court's order.

The trial court granted the petition in part on June 23, 2020. Its written decision concluded as follows:

Substantial evidence supported the City's assertion that LTC's bid was non-responsive because its sample did not pass the DSR test. LTC's sample was tested three times on equipment that was calibrated less than a few weeks before the tests occurred, and each time LTC's sample failed to meet the specifications. Based on testing and experience, LTC's asphalt binder would result in rutting and increased incidents of pavement deformation leading to overall shorter pavement lifespan. The City deemed LTC's failure to pass the performance standard a material deviation from the specifications.

LTC's attempt to challenge the reliability of the City's tests was not persuasive. Evidence Code section 664 creates a presumption that an official duty has been regularly performed. Once official test records are submitted, the burden shifts to the opposing party to demonstrate that the test was not properly performed. LTC presented no evidence that the employee who performed the DSR test did not do so properly or that the

14

rheometer was improperly calibrated. Further, LTC had an opportunity to perform tests on its own sample but admitted that it did not do so, and LTC's chief operating officer admitted that he did not know if LTC was capable of manufacturing medium asphalt binder that would meet the City's specifications.

LTC also had the opportunity to request a modification of the specifications before the bid closed, but it did not do so. It further failed to disclose its product's deviation from the specifications through a letter attached to its bid proposal, which the RFQ required it to do. And, the City had the discretion to reject LTC's product sample for failing to meet the specifications, regardless of how small the deviation was. The City was not required to accept LTC's assertion that its deviation was inconsequential, which was controverted by the City's research. The City's decision that the DSR result is a material failure rendering LTC's bid nonresponsive is dispositive.

However, SJR's bid was also nonresponsive because SJR failed to attend the pre-bid meeting. Because the RFQ said the pre-bid meeting was mandatory, the City did not have the power to waive it. The City also could not waive SJR's late submission of its binder sample because the RFQ stated that a bid would be " 'deemed nonresponsive' " if a sample was not timely submitted. Moreover, "SJR's failure to attend the mandatory meeting at least arguably gave it a competitive advantage because LTC wasted time and effort in attending, and SJR's failure to timely submit a sample plainly gave it a competitive advantage over LTC. Nor did the waiver of these obligations benefit the City."

Finally, the court rejected LTC's claim of improper favoritism. The court found: "The City gave SJR no special treatment in the pre-bid meeting process. When SJR Manager

Hollis asked for a postponement of the pre-bid BIP meeting because he had injured his back and could not attend, his request was denied and SJR was told it would not be able to bid.  SJR never lobbied for or was consulted with respect to the waiver of the mandatory BIP outreach.  [¶]  Nor did SJR receive favoritism in the post-award and appeal process.  The Supply Division met with LTC's attorneys . . . on March 11, 2019.  SJR did not participate.  At the end of the meeting, the Supply Division agreed to follow-up with RHS regarding the Specification and the timing of SJR's binder sample, as well as to assess LTC's contention that the use of pricing indexes from different months would reduce LTC's total bid.  After the meeting, the City admitted that [the Department of General Services] erroneously tabulated the bids and that LTC was the lowest monetary bidder, albeit not the lowest responsive bidder.  On March 14, 2019, the Purchasing Agent and Supply Chain Director Yusilon ruled that LTC's appeal [was] valid and had merit.  The City subsequently reported that it would cancel and re-bid the Contract.  Only when LTC's counsel objected to the rebid did the City re-evaluate the award.  [¶] . . . [¶]  In sum, there is no evidence of favoritism toward SJR or corruption in the bid process."

Based on the foregoing, the trial court found that the City "had a mandatory duty to reject SJR's bid as nonresponsive." However, "the City did not have a mandatory duty to award the Contract to LTC, as LTC's bid also was non-responsive."

On August 12, 2020, the trial court entered judgment granting a writ of mandate and denying or dismissing LTC's remaining causes of action.  On August 20, 2020, the court issued a writ of mandate directing the City to vacate its contract award

16

to SJR.  The writ did not direct the award of the contract to LTC, and the City was permitted to rebid the contract at its discretion.

## VIII.  LTC's motion for attorney fees; notices of appeal.

LTC moved for an award of attorney fees of $1,008,992 pursuant to Code of Civil Procedure section 1021.5.  The trial court denied the motion, concluding that while LTC was a successful party, it did not vindicate an important right affecting the public interest.

The City and LTC appealed from the judgment, and LTC appealed from the order denying the motion for attorney fees.[6]

## STANDARD OF REVIEW

Judicial review of a public agency decision is obtained through a petition for writ of ordinary or administrative mandate.  (Code Civ. Proc., §§ 1085, 1094.5.)  Quasi-legislative

---

[6]     On October 12, 2022, LTC filed in this court a request for judicial notice of documents relating to a new RFQ issued by the City after the trial court directed it to vacate the contract award to SJR.  The motion is denied.  " 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances.  [Citation.]  'It is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' "  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2; see also *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [same].)  The documents of which LTC seeks judicial notice all post-date the judgment, and LTC has not identified any exceptional circumstances that would justify their consideration.  Accordingly, we decline to judicially notice the documents.

acts are reviewed by ordinary mandate, and quasi-judicial acts are reviewed by administrative mandate. (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 (*McGill*); *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567.)

The award of a public contract is challenged by a petition for writ of ordinary mandate. (See *Konica Business Machines U.S.A., Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449, 451 (*Konica*).) In such an action, the petitioner has the burden to show that the public entity abused its discretion by awarding the contract to the challenged bidder. (*Ibid*.) " ' "Mandamus is an appropriate remedy to compel the exercise of discretion by a government agency, but does not lie to control the exercise of discretion unless under the facts, discretion can only be exercised in one way. [Citations.]" [Citation.]' (*MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 368 (*MCM*); see *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 900 (*Ghilotti*).)" (*Bay Cities Paving & Grading, Inc. v. City of San Leandro* (2014) 223 Cal.App.4th 1181, 1187 (*Bay Cities*).)

Well-established principles govern an appeal from a writ arising out of the award of a public contract. (*Cypress Security, LLC v. City and County of San Francisco* (2010) 184 Cal.App.4th 1003, 1010.) " ' "Our review is limited to an examination of the proceedings to determine whether the [public entity's] actions were arbitrary, capricious, entirely lacking in evidentiary support or inconsistent with proper procedure." ' " (*Ibid*.) " 'In determining these issues, we defer to the [public entity's] factual findings when they are supported by substantial evidence. [Citation.] To the extent our analysis requires us to decide

18

questions of statutory interpretation or determine whether the [public entity's] actions violate applicable law, we exercise our independent judgment. [Citations]' (*Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, 1051–1052, fn. omitted [*Schram*].)" (*Eel River Disposal & Resource Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209, 224 (*Eel River*).)

" 'With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal. [Citations.]' [Citation.] The only exception is where there are foundational matters of fact as to which the trial court's findings could be conclusive on appeal, where supported by substantial evidence." (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303.)

LTC urges that this court should review for substantial evidence the findings of the trial court—not those of the City— but the cases LTC cites do not support this proposition. Only two cases LTC cites concern public contracts; both hold, as we do, that we generally review for substantial evidence the findings of the public entity, not those of the trial court. (See *Ghilotti*, *supra*, 45 Cal.App.4th at pp. 903–904 ["In reviewing the award of a public contract, our function is the same as the trial court's—to decide whether the public entity's decision is supported by substantial evidence"]; *DeSilva Gates Construction, LP v. Department of Transportation* (2015) 242 Cal.App.4th 1409, 1417–1418 (*DeSilva*) [same].)[7] The remaining cases LTC cites

_____

[7]     Contrary to LTC's contention, *DeSilva* does not hold that appellate courts defer to a public entity's findings only if the

19

are not public contract cases and thus do not guide our review here.

We note, moreover, that LTC selectively quotes the standard of review articulated by some of the cases it cites. For example, LTC quotes *Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340 for the proposition that on appeal from the denial of a writ petition, the trial court's findings on foundational matters of fact are conclusive. The full statement, in context, is as follows: "In an appeal from the denial of a petition for a traditional writ of mandate, the trial court's findings on foundational matters of fact are conclusive. *However, with regard to the ultimate question of whether the District or agencies' decision was supported by substantial evidence, the function of the appellate court is the same as that of the trial court, that is, to review the administrative decision to determine whether it is supported by substantial evidence.* This court then reviews the findings and actions of the District or agencies and not the findings of the trial court." (*Ibid.*, italics added.) The court continues: "In a mandamus action arising under Code of Civil Procedure section 1085, judicial review is limited to an examination of the proceedings before the agency to determine whether its actions have been arbitrary or capricious, entirely lacking in evidentiary support, or whether it failed to follow proper procedures or failed to give notice as required by law.

---

public entity held a hearing at which the petitioner had the opportunity to present evidence. At the relevant pages, *DeSilva* held only that the court would not defer to the agency's findings because they were based on an interpretation of a statute—that is, on an interpretation of law—not on the resolution of disputed facts. (*DeSilva, supra,* 242 Cal.App.4th at pp. 1420–1421.)

[Citations.] [¶] In determining whether evidentiary support is present in a traditional mandamus action, the applicable standard of review is the substantial evidence test. [Citations.] The court may not reweigh the evidence and must view the evidence in the light most favorable to the District's actions and indulge all reasonable inferences in support thereof." (*Ibid.*)

## CITY'S APPEAL

In its appeal, the City contends the trial court erred by ordering it to set aside the contract award to SJR because the City had discretion to eliminate the BIP outreach requirements, including mandatory attendance at the pre-bid meeting, and to waive SJR's late submission of its binder samples. As we discuss, the City is correct.

### I. Governing law.

#### A. City Charter and Administrative Code.

The City is a charter city, and thus the Los Angeles City Charter (Charter) and Los Angeles Administrative Code (LAAC) govern its power to award City contracts. (*Michael Leslie Productions, Inc. v. City of Los Angeles* (2012) 207 Cal.App.4th 1011, 1021; *R & A Vending Services, Inc. v. City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1191.) Under the LAAC, all purchases of materials and supplies are made by a City purchasing agent, who "shall . . . prepare and adopt written standards and standard specifications" and "prescribe the procedure for preparation and approval of specifications upon which bids are asked." (*Id.*, §§ 9.1, 9.2, 9.19.) Such specifications "shall be definite and certain and shall permit competition" (*id.*, § 9.21(c)), and every notice of bid request shall be publicly available (*id.*, § 10.15(c)). The notice "shall specify the time and

21

place such bids or proposals will be received," and bidders "may be required to submit with their bids or proposals detailed specifications of any item to be furnished." (*Id.*, § 10.15(c).)

Under the Charter, competitively bid contracts shall be awarded "to the lowest responsive and responsible bidder." (Charter, § 371(a).) This determination "may be made on the basis of the lowest ultimate cost," and "[w]here the items are to constitute a part of a larger project or undertaking, consideration may be given to the effect on the aggregate ultimate cost of the project or undertaking." (*Ibid.*; see also LAAC, § 10.15(f) [same].) In offering contracts for bid, the City "shall reserve the right to reject any and all bids or proposals and to waive any informality in the bid or proposal when to do so would be to the advantage of the City." (*Id.*, § 371(c); see also LAAC, § 10.15(c) [same].)

## B. Scope of City's discretion to waive deviations from contract specifications.

A public contract bid is "responsive" if it fully conforms to the public agency's specifications. (*DeSilva*, *supra*, 242 Cal.App.4th at p. 1422; *Bay Cities*, *supra*, 223 Cal.App.4th at pp. 1188–1189; see also *D.H. Williams Construction, Inc. v. Clovis Unified School Dist.* (2007) 146 Cal.App.4th 757, 764 [bid is responsive if it " 'promises to do what the bidding instructions demand' "].) A public entity has discretion to accept a bid that, while not strictly responsive, " ' " 'substantially conforms' " ' " to the bid request so long as the variance " ' "cannot have affected the amount of the bid or given the bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential. [Citations.]' " ' (*Valley Crest* [*Landscape, Inc. v. City Council* (1996)] 41 Cal.App.4th [1432,] 1440–1441 [(*Valley*

22

*Crest*)], quoting *Konica*[, *supra*,] 206 Cal.App.3d [at p.] 454.)" (*DeSilva*, at pp. 1422–1423.) Stated differently, a public entity may waive a deviation from the specifications that is "inconsequential"—that is, it " 'neither give[s] the bidder an unfair competitive advantage nor otherwise defeat[s] the goals of insuring economy and preventing corruption in the public contracting process.' " (*Bay Cities*, *supra*, 223 Cal.App.4th at p. 1189.) These considerations " 'must be evaluated from a practical rather than a hypothetical standpoint, with reference to the factual circumstances of the case. They must also be viewed in light of the public interest, rather than the private interest of a disappointed bidder. "It certainly would amount to a disservice to the public if a losing bidder were to be permitted to comb through the bid proposal or license application of the low bidder after the fact, [and] cancel the low bid on minor technicalities, with the hope of securing acceptance of his, a higher bid. . . ." ' (*Ghilotti*, *supra*, 45 Cal.App.4th pp. 908–909.)" (*Bay Cities*, at p. 1189.) Whether a bid varies substantially from the specifications " ' "is a question of fact." ' " (*Ibid.*, quoting *Ghilotti*, at p. 906; see also *MCM*, *supra*, 66 Cal.App.4th at p. 375.)

## II. The City did not abuse its discretion by eliminating the mandatory BIP outreach requirements from the RFQ, including mandatory attendance at the pre-bid BIP meeting.

LTC contended below, and the trial court agreed, that the City lacked discretion to excuse SJR's failure to attend the pre-bid meeting because the RFQ said attendance was "mandatory." The City urges this finding was erroneous because it was permitted to, and did, remove the entirety of the BIP requirement through Addendum No. 2.

23

The City's authority to eliminate the BIP requirement through an addendum, as well as the legal effect of Addendum No. 2, are questions of law that we review de novo. (*Eel River*, *supra*, 221 Cal.App.4th at p. 224.) For the reasons that follow, we conclude that the City had discretion to eliminate the mandatory BIP requirements from the RFQ, including mandatory attendance at the pre-bid meeting. Thus, as a matter of law, SJR's failure to attend the pre-bid meeting did not render its bid nonresponsive.

### A.    Background.

By executive action, the mayor created the Business Inclusion Program, or BIP, which requires general contractors bidding on City contracts to do outreach to subcontractors owned by underrepresented groups. (See generally *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 165–168.) There are seven BIP compliance requirements (or "indicators") which include attending a pre-bid meeting to learn about the BIP program, sending bidding invitations to potential BIP subcontractors, providing interested potential subcontractors with plans and specifications, and evaluating in good faith all bids or proposals submitted by interested BIP subcontractors.

A City Procurement Analyst may request a waiver of BIP compliance requirements if no subcontracting opportunities are available under a contract. If an RFQ has not yet been issued, a BIP waiver request may be granted by a Supply Division Director; after an RFQ has been issued, a BIP waiver request may be approved only by the mayor's office.

Here, the City did not determine until after the RFQ was issued that no subcontracting opportunities were available, and thus the BIP waiver request was made to, and approved by, the

24

mayor's office.  Thereafter, the City amended the RFQ through Addendum No. 2, which stated:  "The Business Inclusion Program (BIP) Mandatory Outreach has been waived. . . . Attendance to the BIP Meeting is no longer a requirement." ~(9CT 2437)~ The effect of this addendum was to remove the BIP outreach requirements, including attendance at the pre-bid meeting, from the RFQ.

### B.    Analysis.

LTC contended below, and urges on appeal, that the City could not "waive" attendance at the pre-bid meeting because the RFQ characterized such attendance as " 'mandatory.' "  According to LTC, "[where a bid includes admonitions that it will be deemed 'non-responsive' if specific requirements are not met, those requirements are always deemed material and thus unwaivable." Thus, LTC contends, because the RFQ "warned that the meeting was 'mandatory' and that bidders would 'not be allowed to put in their bid' if they [did] not attend the 'Mandatory Pre-Bid/Business Inclusion Program,' " the City lacked discretion to waive SJR's failure to attend the pre-bid meeting.

LTC's contention erroneously equates the distinct concepts of *waiving* and *modifying* bid requirements.  As discussed above, a public entity may "waive" (or "disregard") inconsequential deviations from contract specifications, but may not waive "substantial" deviations from such specifications.  (See, e.g., *Bay Cities*, *supra*, 223 Cal.App.4th at p. 1189 ["the rule that requires ' "strict compliance with bidding requirements does not preclude the contracting entity from waiving inconsequential deviations" ' "]; *Ghilotti*, *supra*, 45 Cal.App.4th at p. 900 [public entity may waive "inconsequential deviations from contract specifications"]; see also Procurement Manual, p. G-18 [defining

"waiver" as "the act of disregarding minor informalities, errors, or technical nonconformities"].) Thus, a public entity may excuse a bidder's failure to comply with bid specifications only if the failure to comply is not substantial.

A different rule applies, however, to a public entity's ability to *modify* bid specifications prior to the bid submission date. Significantly, the Procurement Manual provides that the City may "modify, change, or delete *any material condition* of [an] RFQ" through an addendum to an RFQ. (Italics added.) The Procurement Manual thus expressly permits the City to eliminate even material conditions of an RFQ after its release, so long as the City does so through a formal contract addendum.[8]

Here, the City formally modified the BIP outreach requirement—which both LTC and the City agree was a material term of the RFQ—by issuing Addendum No. 2. Addendum No. 2 changed the terms of the RFQ by removing the mandatory BIP outreach requirements. Having done so, the City had no occasion to "waive" SJR's noncompliance with BIP outreach requirements

---

[8]	LTC suggests that if the City is correct that it can change mandatory or material elements of an RFQ through an addendum, then it "could change any feature of its RFQ at any time throughout the bidding process and render all mandatory requirements and admonitions that failure to comply would render a bidder nonresponsive meaningless." But the express purpose of an RFQ addendum is to allow the City to alter its specifications—even material ones—as appropriate to the City's needs. Although the City theoretically could "change any feature of its RFQ at any time throughout the bidding process," it manifestly would not do so if the change would result in procuring a product or service that would not meet the City's needs.

because those requirements were no longer mandatory bid elements.[9]

Citing the City's Procurement Manual, LTC contends that the City can excuse BIP compliance only if it does so before issuing an RFQ; it thus urges that Addendum No. 2, which was issued after the RFQ's release, did not excuse SJR's failure to attend the pre-bid meeting. In support, LTC relies on section 5.1.3 of the Procurement Manual, which describes the procedure for waiving the BIP requirement prior to releasing an RFQ. Specifically, section 5.1.3 provides: "When no subcontracting opportunity can be identified, the [procurement analysist] must include a written justification with a request to waive the Business Inclusion Program Outreach Process. . . . The Director of Supply Chain Services, or the Director's designee, shall determine the applicability or validity of any submitted waiver request and approve the waiver prior to the RFQ release." But as the City correctly notes, this provision governs only BIP waivers that are sought *before* an RFQ is issued, and nothing in the provision precludes the City from eliminating the BIP requirement through an addendum *after* an RFQ has been released. Indeed, as we have discussed, section 7.3.2 of the Procurement Manual specifically permits the City to issue an

---

[9]    As the City notes, the trial court's error may have stemmed from the language of Addendum No. 2, which says that the mandatory BIP requirement "has been waived." This referred to the Mayor's "waiver" of compliance with Executive Directive No. 14, which requires BIP outreach—*not* to the City's waiver of a material term of the RFQ. To the contrary, once the City issued Addendum No. 2, BIP outreach was no longer required, and thus the City would have had no occasion to waive SJR's failure to comply.

addendum "to modify, change, or delete *any material condition* of [an] RFQ." (Italics added.) LTC cites no authority for the proposition that "any material condition" does not include the BIP outreach requirement, nor are we aware of any.

LTC also contends that even if the City could waive BIP compliance generally, it could waive a potential bidder's pre-bid meeting attendance only if it did so "before the pre-bid meeting. In support, it cites the City's BIP program guidelines, which state that a bidder may seek a waiver of the pre-bid meeting requirement "prior to the meeting." This contention again confuses two analytically separate concepts—namely, the City's ability to *seek* a waiver of the BIP requirement entirely because a particular contract has no subcontracting opportunities, and the City's ability to *grant* a waiver of the pre-bid meeting attendance requirement to a particular bidder who has recently attended such a meeting. With regard to the latter waiver, the BIP program guidelines state that if an RFQ requires BIP compliance, the City may "waive" a potential bidder's attendance at the pre-bid meeting "if the [bidder] both certifies in writing that it is informed as to the BIP outreach requirements and has participated in a City-sponsored . . . event in the prior 12 months as is evidenced by the event attendance documents" *and* the RFQ does not say that the pre-bid meeting is mandatory. This waiver provision is irrelevant to the present case, which does not concern the City's ability to waive SJR's attendance at the pre-bid meeting under the BIP program guidelines, but instead addresses its discretion to eliminate BIP compliance from the RFQ *entirely*.

LTC next contends that even if the City generally may excuse a contractor's attendance at a pre-bid meeting, it could not

28

waive SJR's failure to attend the pre-bid meeting because that waiver was intended to give SJR a competitive advantage. LTC made the same contention below, and the trial court rejected it, finding that "[t]he City gave SJR no special treatment in the pre-bid meeting process. . . . SJR never lobbied for or was consulted with respect to the waiver of the mandatory BIP outreach." This was a factual finding by the trial court, and thus we must uphold it if it was supported by substantial evidence. (*San Diegans for Open Government v. City of San Diego* (2018) 31 Cal.App.5th 349, 363.) Substantial evidence unquestionably supported the trial court's finding: Curaming testified that the City eliminated the BIP requirement after LTC's representative, Miller, asked at the pre-bid meeting why BIP outreach was required when the RFQ did not permit the use of subcontractors; and SJR's manager, Hollis, said in his declaration that he "did [not] have any communication whatsoever with any City personnel requesting a waiver of the BIP Mandatory Outreach or requesting that the outreach be converted from mandatory outreach to voluntary outreach." Taken together, the deposition testimony and declaration are substantial evidence to support the trial court's finding that the City did not waive the BIP requirements, including attendance at the pre-bid meeting, to advantage SJR.

Next, LTC urges that even if the City had authority to eliminate the BIP requirement from the RFQ, the City excused *only* BIP outreach, not attendance at the pre-bid meeting. Not so. As the City correctly notes, BIP outreach is one of seven BIP compliance indicators, and thus waiver of the BIP requirement necessarily waived BIP outreach. Further, Addendum No. 2 expressly stated that "[a]ttendance [at] the BIP Meeting is no longer a requirement." Addendum No. 2 thus necessarily excused

29

all requirements of the BIP program, including attending the pre-bid meeting.[10]

Finally, LTC contends that had it known that attendance at the pre-bid meeting would be eliminated as a requirement for bidding on the contract, it "would not have spent the time, money and resources to prepare for and attend the meeting." We agree with the general principle (although LTC cites no authority for it) that amending an RFQ after its release may raise fairness/due process concerns if it is done to advantage a prospective bidder, but as we have said, the trial court found that the City did not eliminate the BIP requirement to advantage SJR, and substantial evidence supports that conclusion.[11]

---

[10]  LTC suggests that a City witness testified that Addendum No. 2 did not waive the pre-bid meeting, but we do not agree. The testimony on which LTC relies is as follows:

"Q: Your testimony is that Daisy [Curaming] pursued a BIP meeting waiver because of a concern that [LTC representative] Austin Miller raised at the meeting?

"A [Melissa Yusilon]: So it's not a waiver of a BIP meeting. It's a waiver of the outreach of the Business Inclusion Program."

Read in context, we understand Yusilon's testimony to mean that Curaming pursued a waiver not of the pre-bid meeting specifically, but of the BIP program generally, of which attendance at the pre-bid meeting was just one part.

[11]  Although not directly relevant to our analysis, we note that there is no evidence that eliminating the BIP requirement materially disadvantaged LTC. Specifically, there is no evidence that LTC failed to comply with the specifications *because* the City eliminated the BIP requirements; to the contrary, but for Addendum No. 2, LTC's bid would have been nonresponsive for

For all the foregoing reasons, we conclude that the City had discretion to eliminate the BIP requirements, including attendance at the pre-bid meeting, and it properly did so through Addendum No. 2. The City thus properly determined that SJR's bid was responsive notwithstanding its failure to attend the pre-bid meeting. The trial court erred in concluding otherwise.

## III. The City did not abuse its discretion by waiving SJR's late sample submission.

It is undisputed that SJR did not timely submit its product samples. The City urges, however, that it had discretion to waive SJR's late sample submission because the noncompliance was inconsequential and did not competitively disadvantage LTC. We agree.

As noted above, in the absence of evidence of corruption, a public entity has discretion to accept a bid that "substantially conforms" to its specifications so long as the variance cannot have affected the amount of the bid or given a bidder a competitive advantage not allowed other bidders. (*DeSilva*, *supra*, 242 Cal.App.4th at pp. 1422–1423; *Valley Crest*, *supra*, 41 Cal.App.4th at pp. 1440–1441; *Konica*, *supra*, 206 Cal.App.3d at p. 454; *Ghilotti*, *supra*, 45 Cal.App.4th at p. 908.) Thus, for example, in *Bay Cities*, *supra*, 223 Cal.App.4th 1181, the Court of Appeal held that a city did not abuse its discretion by awarding a construction project to a bidder that omitted the first page of its

_____

failure to fully comply with the BIP outreach requirement. Further, while LTC invested some resources to comply with the pre-bid meeting requirement, those resources were trivial: The meeting lasted just an hour, and LTC's representative, Miller, admitted that he did not do any preparation for it.

31

bid bond from its submission.  The city deemed the omission inconsequential because it was apparent that the bidder had complied with the bond requirement.  The court agreed, noting that substantial evidence supported the city's determination that the deviation was inconsequential because the bidder submitted sufficient information to demonstrate that it had complied with the bond requirement.  (*Id.* at pp. 1189–1190, 1193–1198.)

In contrast, the Court of Appeal in *Konica, supra,* 206 Cal.App.3d 449, held that a public entity abused its discretion by waiving deviations from bid specifications that allowed a bidder to make a lower bid than would have been possible without the deviations.  There, the public entity requested bids on copy machines that would produce at least 55 copies per minute, had zoom magnification and reduction, and were capable of fully automatic double-sided copying; the successful bidder offered machines that made only 50 copies per minute, did not have a zoom feature, and performed double-sided copying semi-automatically.  The court held these deviations were substantial, and therefore unwaivable, because it was undisputed that adherence to the specifications would have resulted in an increased bid.  (*Id.* at pp. 453, 455.)  Similarly, in *DeSilva*, the court held that a bidder's failure to acknowledge a significant change to the specifications was material because under applicable provisions of the Public Contract Code, the bidder could have withdrawn its bid without forfeiting its bid bond.  (*DeSilva, supra,* 242 Cal.App.4th at pp. 1423–1424.)

LTC contended below, and urges on appeal, that SJR's failure to timely submit product samples was a material deviation because "[w]here a bid includes admonitions that it will be deemed 'non-responsive' if specific requirements are not met,

32

those requirements are always deemed material and thus unwaivable." In other words, LTC suggests, the RFQ rendered the late sample submission unwaivable as a matter of law. But *DeSilva*, the only case LTC cites for this proposition, does not support it. There, the court held that a public entity abused its discretion by allowing a bidder to correct a mistake "that the [agency] *itself* deemed a 'material' deviation." (*DeSilva*, *supra*, 242 Cal.App.4th at pp. 1423–1424.) While *DeSilva* thus holds that a deviation from an RFQ cannot be waived if it is "material"—a proposition of law that the City does not dispute— the case does *not* suggest that a deviation that causes a bid to be "nonresponsive" is necessarily "material." (See generally *id*. at pp. 1422–1425.)

LTC also suggests that SJR's late sample submission could not be waived because it gave SJR an unfair competitive advantage. The trial court agreed, noting that "LTC had to comply strictly with product specifications, while SJR was excused for its compliance," and "[SJR's] untimely sample submission disadvantaged the City by limiting its time to" conduct performance tests. To the extent this conclusion was based on a factual finding, the finding is not supported by substantial evidence. LTC urges that "[i]f LTC had known its sample could have been submitted nearly two weeks later than originally required, LTC would have had the opportunity to test its sample independently and decide whether to seek a departure from the specifications." But LTC introduced no evidence below, and identifies none on appeal, that it was unable to test its product sample due to the sample submission deadline, or that it would have conducted such tests had the sample submission deadline been extended. Nor is there evidence that LTC sought

33

to or was denied the right to submit its own product samples after the December 6 deadline.

The trial court's conclusion that the City's waiver gave SJR a competitive advantage because it held LTC, but not SJR, to strict compliance with performance specifications misunderstands what "competitive advantage" means in the present context. Indisputably, any waiver "advantages" the party whose noncompliance is waived because but for the waiver, that party could not be awarded the contract. But defining "competitive advantage" in this way would prohibit the City from waiving *any* deviations, even immaterial ones. The Charter says otherwise, expressly permitting the City to waive a bid "informality" if doing so "would be to the advantage of the City." (Charter, § 371(c); see also LAAC, § 10.15(c) [same].)

Instead, the cases discussed above prohibit a public entity from waiving a deviation that gives a party "an unfair competitive advantage *by allowing it to make a lower bid than it would have been able to make without the deviations*" (*Konica*, *supra*, 206 Cal.App.3d at p. 454, italics added), or giving it the opportunity to withdraw its bid without forfeiting its bid bond (*DeSilva*, *supra*, 242 Cal.App.4th at pp. 1423–1424). There is no suggestion in the present case that SJR's late sample submission either affected its bid price or would have allowed it to withdraw its bid bond without penalty, and thus the City's waiver did not give SJR a competitive advantage as a matter of law.

There is, finally, no substantial evidence to suggest that the City did not benefit from waiving SJR's late sample submission. The trial court said the waiver was not to the City's advantage because "[SJR's] untimely sample submission disadvantaged the City by limiting its time to" conduct performance tests. But the

relevant question was not whether the City would have preferred a timely submission to a late one; it is, instead, whether given SJR's late submission, the City was better served by rejecting SJR's bid or by waiving the late submission and considering SJR's bid on the merits. As to that issue, the City concluded that it benefited from waiving SJR's late submission because the only other bid it received did not satisfy the performance standards and the City's lab was able to test the sample well in advance of the bid submission date. In the absence of evidence of improper favoritism, which the trial court found not present here, we may not second-guess the City's determination of its own best interests. (See, e.g., *Mike Moore's 24-Hour Towing v. City of San Diego*, *supra*, 45 Cal.App.4th at p. 1312 ["It is a legislative function [of a public entity] to consider data, opinion, and arguments, and then to exercise discretion guided by considerations of the public welfare"; thus, court will not disturb public entity's decision where its reasonableness "is fairly debatable"].)

For all the foregoing reasons, the trial court erred in concluding that the City lacked discretion to waive SJR's late sample submission.

## LTC'S APPEAL

In its appeal, LTC contends that the trial court erred by (1) finding LTC's sample failed to meet the RFQ's specifications, (2) finding LTC was not the lowest bidder, and (3) denying LTC's motion for attorney fees. As we discuss, these claims lack merit.

I.      **The City did not abuse its discretion by concluding that LTC's product sample did not meet the RFQ's specifications.**

A.      **The trial court properly admitted the City's report of LTC's test results.**

LTC contends the City abused its discretion by concluding LTC's product sample did not meet the RFQ's specifications because there was no competent evidence that the sample was tested properly.  We disagree.

LTC urges that the trial court erred by admitting the City's report of LTC's test results—which LTC contends was "without foundation"—on the court's "own motion" and "over LTC's objection."  In fact, LTC did not object below to the admission of the City's report of LTC's test results.  To the contrary, LTC *stipulated* that that the report was "a true and correct copy of [LTC's] Test Results," thus establishing the report's authenticity. (See Evid. Code, §§ 1400 [authenticating a writing means introducing evidence "sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is"], 1414, subd. (a) [writing may be authenticated by evidence that the party against whom it is offered has admitted its authenticity].)

LTC's real objection appears to be not that an insufficient foundation was laid to admit the report, but rather that the City did not establish that the underlying tests were reliable.  The trial court rejected this contention, concluding that LTC failed to rebut the statutory presumption that an official duty has been regularly performed.  We agree.  Evidence Code section 664 (section 664) creates a rebuttable presumption that an official duty has been regularly performed.  (See also *Baker v. Gourley*

36

(2000) 81 Cal.App.4th 1167, 1172–1173; *Roelfsema v. Department of Motor Vehicles* (1995) 41 Cal.App.4th 871, 879.)  Once a public entity meets this initial burden to establish a prima facie case, a challenger may rebut the presumption with " 'affirmative evidence of the nonexistence of the presumed facts sufficient to shift the burden of proof back to the [public entity].' "  (*Delgado v. California Department of Motor Vehicles* (2020) 50 Cal.App.5th 572, 577 (*Delgado*); *Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1233.)  The challenger's showing " 'cannot rest on speculation, but must demonstrate a reasonable basis for an inference that the procedures were not properly followed.' "  (*Petricka v. Department of Motor Vehicles* (2001) 89 Cal.App.4th 1341, 1348.)  If the [challenger] meets that burden, the burden shifts back to the [agency] to prove the test was reliable despite the violation."  (*Delgado*, at p. 577.)

Here, it is undisputed that the City's Asphalt Binder Lab has been fully accredited by AASTHO and routinely tests the City's asphalt binder.  It further is undisputed that on December 5, 2018, the lab prepared a report stating that LTC's sample "was tested for determination of Rheological Properties and compliance to Performance Grade Classification (AASHTO M320-17)," and the sample tested "out of specification" on the DSR test because the reference range was 1.50 to 3.00 kPa, and LTC's sample tested at 1.47 kPa.  The report was signed by director Ray Solomon and stamped by Solomon and engineer-in-charge Leon Vainer.

Under section 664, the signed and stamped report issued by the lab, which was prepared in the ordinary course of its duty to test and report on the quality of asphalt binder, gave rise to a presumption that the testing of LTC's sample was regularly

37

performed.  The burden therefore shifted to LTC to produce affirmative evidence to the contrary—that is, evidence that the machines were not properly calibrated or that the tests were not properly performed.  LTC provided no such evidence.  To the contrary, LTC *stipulated* that it did not test its sample before submitting it to the City, and its chief operating officer admitted he did not know if LTC's binder could meet the City's specifications.

LTC urges that the City was not entitled to the section 664 presumption unless it made a "foundational" showing regarding its licensing and procedures, but the case LTC cites for this proposition does not support it.  Instead, *Shannon v. Gourley* (2002) 103 Cal.App.4th 60, which addressed a plaintiff's challenge to blood-alcohol test results produced by a county crime lab, states as follows:  "Generally, the foundational showing necessary for the admission of blood-alcohol test results consists of evidence demonstrating the testing device was working properly and a qualified operator correctly administered the test.  [Citation.] . . . . [¶]  Procedurally, it is a fairly simple matter for the DMV to introduce the necessary foundational evidence.  [Section 664] creates a rebuttable presumption that blood-alcohol test results recorded on official forms were obtained by following the regulations and guidelines of title 17.  [Citations.]  *Test results from authorized laboratories, performed by public employees within the scope of their duties . . . are presumptively valid and the DMV is not required to present additional foundational evidence.*"  (*Id.* at pp. 64–65, italics added.)  Read in context, therefore, *Shannon* suggests that the foundation for admitting the test results in the present case was laid by

38

evidence that the test was performed by Asphalt Binder Lab employees in the scope of their duties.

Citing *Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, LTC further contends that to rebut the section 664 presumption, LTC did not have to show that the City's test results were inaccurate, only that the records were not "trustworthy." But that is not what *Molenda* says. The principle of law articulated in *Molenda* is that " 'the presumption of official duty regularly performed (Evid. Code, § 664) supplies sufficient indicia of the trustworthiness of [the] test results to justify reliance upon such results . . . subject to a showing by the licensee that the test was not performed in compliance with statutory requirements.' " (*Molenda*, at p. 1003.) In that case, however, the court found that the facts did not give rise to a section 664 presumption because the results of a preliminary alcohol screening breath test had not been recorded on an official form or signed by the arresting officer. Instead, the officer "made a notation on the . . . form indicating that Molenda had submitted to a blood test." (*Molenda*, at p. 1004.) The court concluded that a reasonable inference from this evidence was that "the officer intended to rely on the results of the blood test, not the [breath] test," and thus the agency could not rely on the section 664 presumption to establish the foundation necessary to admit the preliminary alcohol screening test. (*Molenda*, at p. 1004.)

The present case is distinguishable from *Molenda*. As described, the asphalt binder test results were recorded by a test operator and reviewed by a supervisor, and the resulting report was signed and stamped. An engineer calibrated and certified the rheometer on October 9, 2018, just a few weeks before the

39

City tested LTC's binder sample. Thus, the trial court properly applied the section 664 presumption.

Finally, LTC urges that the declaration of Villacorta, the Roads and Highways Section head, did not reliably establish that the tests of LTC's sample were properly performed because Villacorta "was not involved in testing LTC's product sample in any way and took it on faith the tests were performed correctly." Not so. Villacorta did not purport to testify about how LTC's sample was tested; instead, he testified generally about the purposes of the various asphalt binder tests performed by the Asphalt Binder Lab, which he was responsible for overseeing, and how LTC's binder performed on the lab's tests as reflected on the lab's official report. This testimony was sufficient to give rise to the presumption of regularity under section 664, shifting the burden to LTC to rebut the presumption by introducing contrary evidence. Because LTC failed to do so, the trial court properly concluded that the City had established that LTC's sample did not meet the product specifications.

### B. The City did not abuse its discretion by concluding that LTC's sample did not substantially comply with the specifications.

Alternatively, LTC contends that its sample "substantially compl[ied] with the DSR specification[s]" because its "reported score was 1.47 kPa or 98% of the specification[,] which exceeded the expected test precision of 6.4%." LTC urges that the trial court "should have held that LTC's binder sample met the City's specifications."

This contention is inconsistent with LTC's suggestion that the City's test results are unreliable or inaccurate. If, as LTC's suggests, there was no reliable evidence that the City's rheometer

40

was properly calibrated or the tests properly performed—and in light of LTC's admission that it did not conduct its own tests and did not know if its binder sample met the City's specifications—the trial court manifestly could not conclude that LTC's sample met the City's specifications. To the contrary, were we to adopt LTC's suggested view of the facts, we would have to find that there was *no* evidence before the City or trial court concerning LTC's compliance with the specifications.

In any event, we cannot conclude, as LTC would have us do, that its sample substantially complied with the specifications because the deviation from the reference range on the DSR test was, *in LTC's view*, inconsequential. The RFQ said the City would consider bids that contained disclosed deviations from the specifications if the products "comply substantially with the specifications," but it also said that the City "*shall be the sole determiner of* substantial compliance with the specifications." (Italics added.) Under the RFQ's express terms, therefore, LTC's view of the significance of its deviation from the specifications is immaterial.

Moreover, as we have said, on questions of fact on which a public entity's exercise of discretion is based, we defer to the agency's findings if they are supported by substantial evidence. (*MCM, supra*, 66 Cal.App.4th at pp. 374–375.) Here, substantial evidence supported the City's determination that LTC's product did not substantially comply with the specifications with regard to dynamic shear. Specifically, Villacorta declared as follows:

—The City developed asphalt binder specifications "based on extensive testing, research, data, experience with local materials, and knowledge of what the City needs to manufacture

41

durable and long-lasting asphalt concrete that can withstand the City's particular loads and traffic conditions."

—"The difference of G*/Sin (δ) between 1.47 kPa and 1.50 kPa may seem small numerically, but the deviation is significant for determining the material's resistance to permanent deformation, rutting and other forms of deterioration. [The Roads and Highways Section] established specified ranges in the Specification to allow test results to deviate a certain amount above and below a target value. The target DSR value for Original medium binder is not 1.50 kPa, which is the minimum value at which a binder will be considered. The edges of the range (1.50kPa and 3.00kPa) represent the maximum distance away from the target value, beyond which the City can no longer accept test results."

—"Based on [the City's] extensive research, testing and experience, the use of LTC's asphalt binder would result in rutting and increased incidents of pavement deformation leading to overall shorter pavement lifespan. This deviation would result in more frequent pavement repairs and construction, and the use of the binder would reduce public safety because rutting and deformations can cause an increase in traffic accidents."

We note finally, as the court did in *MCM, supra*, 66 Cal.App.4th at pages 373–374, that LTC's contention is based on the assumption that if the City may waive deviations from bid specifications, it necessarily abuses its discretion by refusing to do so. As *MCM* explained, the cases that address whether and under what circumstances an agency may waive a deviation from bid specifications "use permissive language to describe the agency's power to waive immaterial deviations: '[A] bid which substantially conforms to a call for bids *may*, though it is not

42

strictly responsive, be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders . . . .' [¶] . . . An agency has discretion to waive immaterial deviations from bid specifications and may accept the bid under certain conditions. The point of discretion is that the agency may properly act in either direction. *It may waive or refuse to waive such deviations.*" (*Ibid.*, italics added and deleted.) We thus conclude that the City was not required to exercise its discretion to waive LTC's deviation from the contract specifications.

## II.    LTC's additional contentions.

LTC contends finally that the trial court erred by failing to declare LTC the low bidder and to award LTC attorney fees. Our conclusion that LTC's bid did not substantially comply with the specifications effectively resolves both issues. With regard to the first issue, the City agrees LTC was the low bidder, but urges LTC was not a *responsive* bidder because its sample did not conform to the product specifications. We agree. The City is required under the Charter to award competitively bid contracts "to the lowest *responsive . . .* bidder." (Charter, § 371(a), italics added.) Because LTC's sample did not satisfy the bid specifications, its bid was not responsive (see *DeSilva*, *supra*, 242 Cal.App.4th at p. 1422; *Bay Cities*, *supra*, 223 Cal.App.4th at pp. 1188–1189), and the amount of LTC's bid therefore was irrelevant.

With regard to the second issue, Code of Civil Procedure section 1021.5 provides that "[u]pon motion, a court may award attorneys' fees *to a successful party . . .* in any action which has resulted in the enforcement of an important right affecting the public interest." (Italics added.) Because we have reversed the

43

portion of the judgment directing issuance of the writ, LTC is not a "successful party," and thus it is not entitled to attorney fees under this section.

## DISPOSITION

The judgment is reversed insofar as it directs the issuance of a writ of mandate requiring the City to set aside the contract award to SJR, and is otherwise affirmed. The cause is remanded with directions to enter a new judgment denying the petition for writ of mandate. The order denying LTC's motion for attorney fees is affirmed. The City is awarded its appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.                                    EGERTON, J.

44